### 1489.   CAPITAL CITY BRICK COMPANY *v.* ATLANTA ICE & COAL COMPANY.

1. The statute of frauds does not require that the contracts with which it deals shall be created in writing, but requires only that there shall be written evidence signed by the party to be charged therewith, showing that the contract was made.

(*a*) Any signed writing, or series of writings internally connected one with another, executed contemporaneously with or subsequently to the contract, intelligible without parol, and showing or admitting an agreement coextensive with the stipulations of the alleged contract, is sufficient to take the promise out of the statute, as against the party so signing.

(*b*) A letter signed by the party to be charged is sufficient to take the agreement out of the statute, if it admits the existence of the agreement, though in the letter the writer seeks to repudiate the contract, on the ground that it was not made in writing.

2. "Although it is the duty of the trial judge to construe a written contract, still if instead of doing so he submits it to the jury for construction, the judgment will not be reversed therefor, where it appears that the proper construction of such contract would have been adverse to the contention of the complaining party."

3. Testimony admissible under one theory of the case as presented by the pleadings and the proof is not to be rejected because, under another theory likewise raised, it would not be admissible.

4. Error which necessarily did not prejudice the complaining party will
not work a reversal.  If the verdict is more favorable to the complain-
ing party than the evidence, most liberally considered in his behalf,
authorizes, he can not successfully complain of inaccuracies in the
charge.

Complaint, from city court of Atlanta—Judge Calhoun. Sep-
tember 29, 1908.

Argued December 14, 1908.—Decided January 27, 1909.

The brick company sued the ice company on an account, for the
purchase-price of about 38,000 bricks at $6 per thousand.  The
defendant admitted getting the bricks, but set up two defenses:
first, that the bricks were not worth $6 per thousand, and that they
were bought as "all hard brick," and apparently were of that
quality, but that after delivery it was discovered that they were
very soft and inferior, and were not worth over $2 per thousand;
also that the defendant had bought from the plaintiff 500,000
hard bricks at the price of $6 per thousand, that the plaintiff had
failed to deliver them, so that the defendant was under the neces-
sity of buying them at the advanced market price of $8 per
thousand; and for the $2 difference a set-off was asked.  The jury
returned a verdict in favor of the defendant against the plaintiff,
for $124.49 and interest.  The case comes to this court upon the
overruling of a motion for a new trial, filed by the plaintiff.

To take the alleged contract as to the 500,000 bricks out of the
statute of frauds, the defendant tendered the following correspond-
ence:  A letter from the president of the ice company to the brick
company, as follows:  "I beg to confirm my telephone conversa-
tion with you this date whereby we have purchased from you 500,000
all hard brick at $6 per thousand and delivered f. o. b. cars, Geor-
gia Railroad yards, this city."  A letter from the president of the
brick company, referring to and replying to this letter, saying,
among other things:  "Since our conversation over the phone, I
had occasion to inquire how our stock of brick were, and the super-
intendent informed me that it would be impossible for us to han-
dle more than 200 M brick of your 500 M order, and have booked
it for that amount.  We wish that we could handle the whole
order; but it is impossible to make brick during the months of
January and February, and we only have a half of a million brick
on hand.  With the orders on our books and having to take care of

our regular customers, we find it impossible to handle more of your order than as stated above. . . If satisfactory to you, kindly confirm order for 200,000 hard brick at $6.00 per M. f. o. b. cars Atlanta." A letter from the president of the ice company: "Your letter is a great surprise to me, since I definitely traded with you over the phone for 500,000 brick. I have notified other bidders that the contract was placed, and I am now in no position to relieve you from any portion of the order. Having placed this order with Mr. Greenfield, as president of the company, which I am sure you will not deny, I can not release you from your obligation to deliver the brick. Please arrange to begin loading the brick next week, and confirm contract made by phone." A letter from the brick company: "In regard to our filling your order for 500,000 brick, nothing would give us more pleasure than to fill the whole amount, were it possible; but as we can not make the weather, and as clay and negro labor will not adhere to our wishes, it is impossible for any brick yard that works free labor to accomplish anything in either cold or wet weather. However, if the climatic conditions are such that we can run and make any headway, we would be foolish not to be willing to fill your order, as we would have a fair profit in same, and that is what we are in the business for. If you can wait till spring for us to fill a part of the order, it will give us great pleasure to fill the whole contract. Trusting that you understand our position (not having sufficient brick on hand and not being able to make them before spring), and that we will be able to serve you, we beg to remain," etc. "P. S. If you wish us to deliver 200 M of the order, kindly advise us of same." A letter from the ice company: "Referring to your favor of even date, it occurs to me that since we made a distinct trade with your president by phone (which can not be denied) for the 500,000 brick, and notified other bidders that the order had been placed, you can not now legally or morally take the position that, owing to the information received after the trade was made, as to your stock on hand and your lack of facilities, attempt to arbitrarily reduce the order to 200,000. Had there been any opportunity for a misunderstanding of our trade by telephone, you would have grounds to take the position you have, or had you stated by phone that you could have supplied only 200,000 brick, I could have readily split the order. Since receiving your letter,

however, I am unable to get the same quotations I had in hand when you were given the order. I am therefore compelled to insist that the terms of our contract be complied with. Of course I can not wait indefinitely for the brick, but will be as liberal as possible in our demands. Please begin, as requested in my letter of yesterday, to deliver at least the 200,000, and state how soon you can complete the 500,000 order without purchasing them in the open market. I regret this occurrence extremely, and wish that circumstances were such that I could release you without serious loss to ourselves." A letter from the brick company: "Yours of yesterday to hand. We can begin delivery of the 200,000 brick sold you the latter part of next week, and kindly ask you to inform us when you wish us to begin on same. In regard to not releasing us from our contract (as you call it) to deliver you 500,000 brick f. o. b. cars Atlanta, morally we are bound to deliver you as many brick as we have on the yard which were not previously sold. This we are only glad to do. Legally we are not bound at all to deliver you any specified sum; for, if you will look at our stationery, you will find that we do not hold ourselves liable for any delay beyond our control. If we can make the brick, we will be delighted to deliver same to you, and there may not be any cause to keep us from delivering them, as fast as you will need same. As to the legal position you mention, in the State of Georgia a contract involving a consideration of $300 or more has to be in writing, and money paid on same before it is binding. As this contract is not in writing, and as the brick market in Atlanta does not vary to any great extent in 24 hours, the time consumed after your message over the phone before we informed you that possibly we could not supply you over the 200,000 brick, we have to decline to buy you any brick in the open market, should we not be able to deliver you the whole amount. We certainly regret that you can not get the same quotation that you had before you placed the order with us, and trust that we may be in position to deliver the full amount to you." A letter from the ice company: "Please arrange to begin to deliver some brick next week, and kindly have an authorized official of your company meet me at my office Monday about 12:30, when we can discuss our differences." There is next a letter from the brick company: "We did not get any definite satisfaction from the railroad, and can not enter into a time-limit contract for the

balance of the brick that you will need. If you want the 200,000, we are ready to deliver them now, and, if you want them, let us know, for we have other orders to fill, and when this kiln is empty we will be without brick for awhile." The ice company replied: "We will take the 200,000 brick from you now, with the understanding, however, that we reserve the right to call on you, after you have begun the operation of your kiln, for the other 300,000 brick, and that you agree to furnish same. Of course, if in the meantime we find that it will be necessary for us to have these brick before you begin the operation of your kiln, we may purchase same from outside parties, thereby releasing you from your obligation to deliver same. Please advise promptly if this is satisfactory to you and when you will begin delivery of the 200,000 brick." The brick company then wrote: "We will begin shipping you brick the early part of next week, and trust that we can furnish you the whole amount without any inconvenience on your part; however, we will not hold ourselves responsible for any specified sum to be delivered. You have the same privilege of cancelling order, should our brick not be satisfactory, as we have to cancel contract should our supply become exhausted." The ice company replied: "In your letter of January 24th you agreed to deliver the remainder of the order of 500,000 brick in the spring, and you stated by phone, when the brick were purchased, that you made the best and largest brick in the city. Now I note from your letter you appear to doubt if the quality of the brick you propose to furnish will be satisfactory to me. If the quality is what we bought, all hard well-burnt brick, the 'best in town,' we see no reason for making any reservation regarding the quality. Am I to understand that you now are not inclined to bind yourselves to furnish the remainder of the 500,000 ordered, even after your plant is running for some time in the spring?" The brick company replied: "Beg to inform you that you misinterpreted our letter of the 2nd inst., as we did not wish to convey the idea that our brick are not as represented to you when your order was placed; they are still as good as any brick sold in the Atlanta market. Neither did we wish for you to infer that we would not deliver the full 500,000 order, if the weather permits our making same." In the next letter the ice company complained of the quality of the two cars of brick that had been shipped to it, and said it would not accept any more brick

of that quality. The brick company wrote in reply, contending that the brick were hard brick, and concluding the letter: "If you do not care to receive any more of them, kindly send us check for those you have received, and we will consider the contract cancelled." The ice company answered this, stating that they were willing to submit the question of the quality of the brick to disinterested persons, and added: "We will certainly look to you to fill your contract for supplying us with the brick of the quality purchased, and we can not consent to a cancellation of the contract on account of the quality of the brick in these two cars. Neither can we comply with your request at this time for a check covering the amount of the brick in the two cars mentioned. We ask that you commence immediately to fill your contract, furnishing the brick of the quality purchased, and ask that you kindly advise us how soon the balance of the brick will be furnished." The brick company replied: "As far as we are concerned, we consider your contract broken; for in your letter of the 5th inst. you put us on notice that the brick we sent you were not the kind you wanted; and, as they are the kind we sold you and the only kind we make (all hard common building brick), we can not afford to send you any more of them, and after they have been delivered put you in position to say, 'on March 5th we put you on notice that you are not sending us the brick we bought from you; therefore we decline to pay you for same.' We still affirm that we make as good brick as any company in Atlanta, and furthermore state that the brick we delivered you are as good as any brick made or sold in Atlanta. Before we will consider delivering you any more brick, we must insist that you mail us a check in full for those you have received, and make a witnessed statement in writing that you will call on us for more than 200,000 brick, and that those brick you have received are satisfactory, and that the balance of the brick that we will send you (after this statement has been made) will be received and will be acknowledged to be the kind of brick you ordered. In your letter of the 5th inst. you put us on notice that you will not pay for the brick, and we are not in business for glory." The ice company answered, calling attention to the terms of the contract and demanding immediate compliance, and stating that if such compliance was not granted, the matter would be put in the hands of an attorney. This ends the correspondence, so far as it is material.

These letters connect themselves with one another by references in the beginning of each of them to the preceding letter, according to date.

*E. M. & G. F. Mitchell,* for plaintiff.

*Payne & Jones,* for defendant.

POWELL, J. (After stating the foregoing facts.)

We have set forth the foregoing letters at some length because the case here largely turns upon the question as to whether they are sufficient, under the statute of frauds, to hold the brick company to the alleged contract to deliver to the ice company 500,000 bricks. It will be noticed, in the letters written by the ice company, the terms of the contract are definitely stated; nowhere does the brick company deny that such a contract was really made. Indeed, a close examination of the correspondence will show that in several instances the brick company clearly recognized that such a contract had been made, though nowhere in the letters is there any direct agreement on their part to abide the contract. In one of the letters there is a practical admission by the brick company that the contract asserted by the ice company had been made, coupled with an attempt to repudiate it because of lack of compliance with what the writer evidently thought were the terms of the statute of frauds—an admission of being morally bound by the contract, accompanied with a claim of not being legally bound, because the agreement was not in writing. The very failure of the brick company to deny that the contract was made as the ice company contended is, under the nature of the correspondence and the manner in which that contract is asserted by the ice company throughout the correspondence, practically an admission that the agreement was made as claimed. Civil Code, § 5155; *Bray* v. *Gunn,* 53 *Ga.* 145; *McLendon* v. *Wilson,* 52 *Ga.* 42. We have but little difficulty in holding that the course of the correspondence, by the signed admission of the brick company, evidenced the agreement alleged by the ice company, though the former, throughout the correspondence, sought to repudiate the old contract and to make a new one. The statute of frauds does not contemplate that the contract between the parties shall necessarily be made originally in writing, but requires only that, as against the party to be charged, it shall be evidenced sooner or later by a writing, signed by him or by some person legally authorized to act in his behalf. It is not:

necessary that the writing by which the contract is to be evidenced should have been executed simultaneously with the making of the contract; any writing, contemporaneous or subsequent, in which the party to be charged admits, over his signature, all the terms. of the contract insisted on by the opposite party, is sufficient. "The moment written evidence of the contract under his hand, in whatever form, exists, the contract is taken out of the statute, even though such an admission is in the form of a letter repudiating the contract." Wood on Statute of Frauds, § 334. To the same effect see Buxton v. Rust, L. R. 7 Exch. 279 (see also page 1 of the same. volume) ; Bailey v. Sweeting, 9 C. B. (N. S.) 843, 30 L. J. (C. P.) 150 ; Wilkinson v. Evans, L. R. 1 C. P. 407. The only exception to this rule, so far as we are aware, is where the defendant in his. pleadings admits the contract, but at the same time claims the benefit of the statute. See *Hollingshead* v. *McKenzie*, 8 *Ga.* 459 ; *Douglass* v. *Bunn*, 110 *Ga.* 165 (35 S. E. 339). Our Civil Code, § 4037,. would seem to negative even this exception which in the cases just. cited has been recognized by the courts. The requisite written evidence may be supplied from a letter written by the party to be charged (*Foster* v. *Leeper*, 29 *Ga.* 294; *Georgia Refining Co.* v. *Augusta Oil Co.*, 74 *Ga.* 508; *Pitcher* v. *Lowe*, 95 *Ga.* 426, 22 S.. E. 678), or from a course of correspondence (*Erwin* v. *Harris*, 87 *Ga.* 333, 13 S. E. 513). Indeed, any signed writing or series of writings internally connected, intelligible without parol aid, and showing or admitting an agreement coextensive with the stipulations of the alleged contract, is sufficient. *North* v. *Mendel*, 73 *Ga.* 400 (54 Am. R. 879) ; *Lester* v. *Heidt*, 86 *Ga.* 228 (12 S. E. 214,. 10 L. R. A. 108). If in a series of writings the party to be charged definitely admits a previous agreement complete in all the usual elements of a contract, this agreement will be enforced, though the minds of the parties do not meet upon the new or additional. things proposed or discussed in the course of the correspondence. For where the statements made by the party in the correspondence are used, not to create a contract, but merely to evidence one already made and fully complete, save only as to the formality of written evidence, the requirement of a present mutuality, so far as these writings are concerned, is of no applicability. Contracts. must not be unilateral; admissions are, in a sense, usually so. Compare *Austin* v. *Long*, 1 *Ga. App.* 258 (57 S. E. 964).

2. The plaintiff in error complains that the judge did not construe the correspondence, but left it to the jury to say whether the letters were sufficient to show the contract claimed by the ice company. As a general rule, it may be said that "the question whether or not certain letters or telegrams or both constitute a contract is one to be determined by the court, and it is error to submit it to the jury." 9 Cyc. 776, and cit. Whether this rule applies with full force where writings are introduced, not as the original embodiment of the contract itself, but merely as evidentiary of a contract already made, it is not necessary for us to decide; for if the judge himself in the present case had construed the writings, instead of submitting them to the jury, he should have construed them adversely to the contention of the complaining party, just as the jury seems to have done. "Although it is the duty of the trial judge to construe a written contract, still if instead of doing so he submits the same to the jury for construction, the judgment will not be reversed therefor, where it appears that the proper construction of such contract would have been adverse to the contention of the complaining party." *Moss Manufacturing Co.* v. *Carolina Portland Cement Co.,* 1 *Ga. App.* 232 (57 S. E. 914); *Main* v. *Simmons,* 2 *Ga. App.* 821 (59 S. E. 85).

3. Over the objection of the plaintiff the court allowed the president of the defendant ice company to testify as to his having made the oral contract for the 500,000 bricks. Since the defendant contended that the contract was taken out of the statute of frauds not only by the letters, but also by part performance under it, through the delivery of a portion of the quantity of brick involved, this evidence was admissible. It is true that the plaintiff's testimony tended to show that the bricks sued for were not delivered under the parol contract set up by the defendant; but since there was testimony to the contrary, the court properly allowed this testimony in support of the theory of the defendant's case.

4. In charging upon the measure of damages, the court made some palpable verbal slips. They were so obviously slips of the tongue as hardly to have been misleading to the jury. However, all this becomes immaterial, for the verdict of the jury was in a smaller amount against the plaintiff than the evidence demanded. In other words, if the court had directed the verdict rendered, we would not have reversed the judgment upon the complaint of the

plaintiff in error. If the letters show a valid contract for the 500,000 bricks, as we are here holding they do, the verdict is even more favorable to the brick company than it had any right to ask.

*Judgment affirmed.*