CITICASTERS COMPANY, Appellee,

v.

STOP 26–RIVERBEND, INC. et al., Appellants.*

Court of Appeals of Ohio,
Seventh District, Mahoning County.

Nos. 00 C.A. 149 and 00 C.A. 212.

Decided May 2, 2002.

---

* Reporter's Note: An appeal to the Supreme Court of Ohio was dismissed for want of prosecution in 96 Ohio St.3d 1404, 2002-Ohio-3119, 770 N.E.2d 594.

532

See also 107 F.Supp.2d 871.

534

**536**

Graydon, Head & Ritchey, LLP, J. Michael Debbeler and John C. Greiner, for appellee.

Bricker & Eckler LLP, Percy Squire and Matthew J. Arnold, for appellants.

GENE DONOFRIO, Judge.

{¶ 1} Defendants-appellants, Stop 26–Riverbend, Inc. ("Stop 26"), Esq. Communications, Inc. ("ESQ"), and attorney Percy Squire ("Squire"), appeal a decision of the Mahoning County Common Pleas Court finding them in contempt of court.

{¶ 2} The relationship between the parties here dates back to at least May 20, 1998 when plaintiff-appellee, Citicasters Co.[1] ("Citicasters"), and Stop 26 entered into an Assets Purchase Agreement ("APA") whereby Stop 26 agreed to sell to Citicasters certain assets associated with the ownership and operation of a radio station now known as WBTJ, 101.9 FM ("the Station or 101.9").[2] The studio for

---

1. Now known as Citicasters Licenses, Inc.

2. The background and operative facts of this case were more fully developed when the case was transferred to federal court. See *Citicasters Co. v. Stop 26–Riverbend, Inc.* (N.D. Ohio 2000), 107 F.Supp.2d 871. A large portion of the factual background recited herein is borrowed verbatim from that court's decision.

101.9 is located in Youngstown, Ohio, and the transmitter site is owned by ESQ. Purportedly, there is substantial identity between the officers, directors, and shareholders of Stop 26 and ESQ. Under the APA, Stop 26 agreed to cause ESQ to convey ownership of the transmitter site to Citicasters. Pursuant to various promissory notes and amendments to the APA, Citicasters advanced to Stop 26 $1,725,000 of the $2,750,000 total purchase price. The advance was secured by a security interest on the Station's assets.

{¶ 3} In connection with the advance, the parties also entered into a Time Brokerage Agreement ("TBA") dated June 30, 1998,[3] whereby, for a monthly fee of $12,000, Stop 26 agreed to accept and broadcast programming supplied by Citicasters.[4] The TBA's term is until the APA is either closed or terminated, neither of which has occurred. Citicasters had broadcast its programming on the Station from June 30, 1998 until the events which sparked this lawsuit.

{¶ 4} Citicasters filed its complaint in Mahoning County Common Pleas Court on June 20, 2000, and, on that same day, obtained a temporary restraining order ("TRO") against Stop 26. The complaint alleged that, on June 1, 2000, Stop 26, through its counsel and principal shareholder Squire, advised Citicasters by letter that Stop 26 intended to resume operational control of WBTJ on or about June 11, 2000.[5] Stop 26 had been broadcasting programming to Youngstown's adult African–American community, its target audience, on WRBP, 1440 AM pursuant to the terms of another TBA with that station's owner. Stop 26 had been intending to sell WBTJ to Citicasters and buy the 1440 station but, due to its inability to obtain financing, Stop 26 has never been able to close either deal. The owner of 1440 got tired of waiting and found another buyer.

{¶ 5} Citicasters rejected the proposal contained in the letter of June 1, 2000. Therefore, on June 12, 2000, Stop 26 sent another letter indicating that it was

---

**3.** A copy of the TBA is attached to the complaint.

**4.** Pursuant to federal regulations, the TBA was filed with the Federal Communications Commission ("FCC") on August 16, 1999. The FCC has never objected to any of the terms of the TBA.

**5.** {¶ a} A copy of this June 1st letter is attached to the complaint. The proposal in the letter was as follows:

{¶ b} "1. Stop 26 and Percy Squire will immediately confess judgment for the full advance plus interest with an enforcement date of September 1, 2000;

{¶ c} "2. Stop 26 resumes broadcasting on WBTJ on June 11, 2000;

{¶ d} "3. No TBA payment is made for June, 2000;

{¶ e} "4. Stop 26 provides immediate evidence to [Citicasters] of the progress of financing; and

{¶ f} "5. Stop 26 continues to work on acquisitions in Youngstown and elsewhere and works with [Citicasters] to clear any Department of Justice or other regulatory issues in Youngstown or any other market where it will be helpful."

terminating the TBA, that it intended to resume operations on 101.9 on June 21, 2000 and that it would notify the FCC immediately that the Station's call letters would change from WBTJ to WRBP on June 21, 2000.[6] Citicasters rejected this proposal by letter dated June 13, 2000.[7]

{¶ 6} Although there was an additional series of letters exchanged, the parties remained at an impasse and Citicasters filed its complaint and obtained a TRO from the Mahoning County Common Pleas Court on June 20, 2000. The Mahoning County Common Pleas Court ordered appellants "restrained from in any manner, either directly or indirectly, interfering, obstructing, or disrupting [Citicasters] in broadcasting its programming from WBTJ, 101.9 FM or taking any actions in violation of [Citicasters'] rights under its Time Brokerage Agreement." On the same day, Stop 26 removed the case to the United States District Court, Northern District, Eastern Division, and, on June 21, 2000, filed a motion to dissolve the TRO. After a conference with the parties, the federal court issued an order on June 21, 2000, dissolving the TRO and setting up a schedule whereby Citicasters would be permitted to move to reinstate the TRO and/or to remand the case. The parties subsequently represented to the federal court that they had agreed to temporarily retain the status quo while they attempted to work out a mutually agreeable solution. They requested that the filing deadlines be extended to July 7, 2000, and an order to that effect was issued on June 27, 2000.

{¶ 7} On June 29, 2000, Squire, principal shareholder of and counsel for Stop 26, met with representatives of Citicasters to discuss proposals concerning alternatives for consummating the acquisition of the Station. Citicasters indicated its willingness to work with Stop 26 toward a mutual solution. It agreed to a material reduction in the amount of Stop 26's outstanding promissory note obligations to Citicasters, provided Stop 26 would be able to negotiate similar agreements with its principal secured creditors and provided further that such reductions would permit the transfer to Citicasters of the Station's assets free and clear of all third party claims.

---

6. {¶ a}   A copy of this June 12th letter is attached to the complaint. It proposed, in full, as follows:
   {¶ b}   "1. Stop 26 returns herewith one-third (1/3) of [Citicasters'] June time brokerage payment;
   {¶ c}   "2. Stop 26 and [Citicasters] begin public announcement of the June 21 transition on June 14, one week before the transition (we previously agreed to defer the transition until June 21, at Mr. Kelley's request, in order to avoid a change before completion of the ratings period); and
   {¶ d}   "3. As soon as practical Stop 26 and [Citicasters] issue a joint press release in relation to the transition."

7. A copy of this letter is attached to the complaint.

{¶ 8}   In response to Stop 26's stated desire to resume broadcasting to its target audience in the Youngstown area, Citicasters offered to sell Stop 26 several radio stations in Youngstown, contingent upon several matters including Stop 26's ability to obtain financing for the transaction and Stop 26's ability to concurrently close the purchase of 101.9.

{¶ 9}   Notwithstanding Squire's expressed appreciation for Citicasters' attempts to resolve this matter, by letter dated June 30, 2000, Squire proposed to preempt 30 percent of Citicasters' programming beginning July 1, 2000, indicating that he would not implement any changes if Citicasters disclosed its plans within a reasonable time.   Although Citicasters responded by telephone within two hours, its programming was completely preempted beginning on July 1, 2000, at approximately 6:58 p.m. local time.   The programming was replaced by Stop 26's programming.

{¶ 10}   Believing that it was being threatened with loss of its programming on 101.9 and in anticipation of what it deemed an eventuality, at about 12:35 p.m. on June 30, 2000, Citicasters began simulcasting its 101.9 programming, a product Citicasters calls "The Beat," on 95.9 FM. It is this simulcasting which Stop 26 holds out as justification for its assertion of rights under paragraph 4 of the TBA.[8] Stop 26 is of the view that simulcasting violates Section 73.3556, Title 47, C.F.R., giving Stop 26 the right to cancel Citicasters' programming on 101.9, an action which it took at about 6:58 p.m. on July 1, 2000.

{¶ 11}   On July 3, 2000, Citicasters filed a motion for temporary restraining order and motion to remand in federal court.   Subsequent to a hearing on the motions, the federal court filed a memorandum decision and order on July 6,

---

8.   {¶ a}   Paragraph 4 provides:

{¶ b}   *"Programming:* Broker shall furnish or cause to be furnished the Programming, which shall be an entertainment format, and may include, without limitation, news, promotions (including on-air giveaways), contests, syndicated programs, barter programs, paid-for programs, locally-produced programs, advertising commercial matter, including that in both program or spot announcement forms, and public service information.   On a regular basis, Licensee shall air, or shall require Broker to air, on the Station programming on issues of importance to the local community. *All actions or activities of Broker under this Agreement, and all Programming provided by Broker shall be in accordance with (i) the Communications Act of 1934, as amended; (ii) Federal Communications Commission (the "FCC") rules, requirements and policies,* including, without limitation, the FCC's rules on plugola/payola, lotteries, station identification, minimum operating schedule, sponsorship identification, political programming and political advertising rates;   (iii) all applicable federal, state and local regulations and policies;   and (iv) generally accepted quality standards consistent with Licensee's past practices. *Broker agrees that, if in the sole, good faith judgment of the Licensee or the Station's General Manager, Broker does not comply with the standards of this paragraph, Licensee may suspend or cancel any Programming not in compliance.*   The right to use the Programming and to authorize its use in any manner and in any media whatsoever shall be, and remain, vested solely in Broker, subject in all events to the rights, if any, of others in such Programming."   (Emphasis added.)

2000. The court decided that the case had been improperly removed to federal court. The decision was based on the court's finding that the case involved a breach-of-contract claim and did not implicate any federal questions. Accordingly, the federal court ordered that the case be remanded to the Mahoning County Common Pleas Court. The United States Court of Appeals for the Sixth District declined to review the decision and also denied a petition for writs of prohibition and mandamus filed by Stop 26.

{¶ 12} On remand, Citicasters filed an amended and supplemental complaint and a motion to reaffirm and continue the TRO in Mahoning County Common Pleas Court. On July 21, 2000, the court issued an order reaffirming and continuing the TRO. Stop 26 and ESQ appealed the order to this court. Subsequently, the appeal was dismissed for lack of a final appealable order. See *Citicasters Co. v. Stop 26–Riverbend, Inc.* (Aug. 17, 2000), Mahoning App. No. 00 C.A. 144.

{¶ 13} On July 25, 2000, Citicasters filed a motion requesting an order to show cause why Stop 26 and ESQ should not be held in contempt for violating the TRO. That same day, the trial court put on the requested order.

{¶ 14} On July 27, 2000, Stop 26 and ESQ filed a motion to dismiss and a memorandum concerning the court's order to show cause. Stop 26 and ESQ argued again that the trial court lack subject matter jurisdiction and that the proper place for the case was in federal court.

{¶ 15} That same day, the trial court held a hearing on Citicasters' motion for contempt. At the hearing, the attorneys for Citicasters requested that Stop 26, ESQ, and Squire be held in contempt of court. Citicasters alleged that Stop 26 and ESQ had failed and refused to allow Citicasters' programming to be broadcast, in violation of the TRO. Squire, appearing on behalf of Stop 26 and ESQ, admitted that they had not complied with the court's order. Squire reiterated his argument that the court was without subject matter jurisdiction. Additionally, Squire expressed surprise that he individually had been made a part of the contempt motion.

{¶ 16} The court found Stop 26 and ESQ in contempt. The court ordered Stop 26 and ESQ to begin broadcasting Citicasters' programming pursuant to the TBA by 3:00 p.m. The court also fined appellants $10,000 per day beginning on July 22, 2000, and continuing each day until compliance with the TRO.

{¶ 17} Concerned that Squire did not have adequate notice that he personally was included in the show cause order, the court deferred the issue of Squire's contempt for a hearing at a later date. Later that day, the court filed a formal order for Squire to show cause why he should not be held in contempt for violating the TRO and set the matter for a hearing.

{¶ 18} Stop 26 and ESQ filed a notice of appeal of the court's contempt order and the case was assigned No. 00 C.A. 149, one of the cases and matters presently before this court. That same day this court issued a temporary stay.

{¶ 19} The following day, on July 28, 2000, the trial court issued another show cause order after counsel for Citicasters informed the court of noncompliance.[9] The order was directed to the officers, directors, and shareholders of Stop 26 and ESQ. Stop 26 and ESQ appealed the order to this court. The appeal was sua sponte dismissed for lack of a final appealable order. See *Citicasters Co. v. Stop 26–Riverbend, Inc.* (Aug. 22, 2000), Mahoning App. No. 00 C.A. 154.

{¶ 20} On July 31, 2000, Stop 26 and ESQ filed in this court an emergency petition for a writ of prohibition. This court dismissed the petition, finding that Stop 26 and ESQ had failed to demonstrate that the trial court was exercising judicial power unauthorized by law. See *State ex rel. Stop 26–Riverbend, Inc. v. Krichbaum* (Aug. 17, 2000), Mahoning App. No. 00 C.A. 153.

{¶ 21} That same day, this court issued a stay of execution of the contempt sanctions on the condition that Stop 26 and ESQ post a $500 bond and comply with the TRO.

{¶ 22} On August 28, 2000, Attorney Harry R. Reinhart filed a notice of appearance as counsel for Squire. Reinhart filed a written plea of not guilty and a jury demand on behalf of Squire. Reinhart also filed a request for notice of the charges against Squire and notice of the intent to use evidence against him.

{¶ 23} On August 31, 2000, the trial court filed a judgment entry in response to Reinhart's requests. The court (1) acknowledged Reinhart's notice of appearance as counsel for Squire; (2) noted but did not accept Squire's written plea of not guilty; (3) denied Squire's jury demand noting that Squire was not entitled to a jury in a contempt proceeding; (4) noted that Squire's request for notice of charges was already answered in an order directed to Squire to show cause why he should not be held in contempt of court for his failure to comply with the TRO; (5) noted that Squire's request for notice of intent to use evidence was inapplicable; (6) noted that Squire had admitted noncompliance with the TRO at the July 27, 2000 hearing; (7) noted that the hearing to determine whether Squire was in contempt for his failure to comply with the TRO would be to determine his role in the noncompliance with the TRO; and (8) requested counsel for Citicasters to present any available evidence to demonstrate Squire's role in the noncompliance. The court also noted that in a conference call that took place with the court and the parties, that the court had been informed that Stop 26 and ESQ had complied with the TRO.

---

9. Citicasters filed a formal notice of noncompliance on July 31, 2001.

{¶ 24} On September 21, 2000, the trial court held a hearing on the order for Squire to show cause why he should not be held in contempt for violating the TRO. Squire appeared represented by his counsel, Reinhart. Reinhart made various objections. Counsel for Citicasters recited the history of the case and referred the court to Squire's previous admission of noncompliance. The court found Squire in contempt and fined him $1,500 and ordered him to pay the reasonable costs incurred by Citicasters in proceeding on the motion to show cause. Squire appealed that decision to this court and the case was assigned No. 00 C.A. 212.

{¶ 25} Squire filed a motion to stay enforcement of the attorney fees sanction pending disposition of the appeal. After a hearing on the motion, this court granted a stay on the condition that Squire post a bond in the amount of $45,294.07 (judgment plus 10 percent interest).

{¶ 26} Presently, this case has given rise to two separate appeals that remain pending before this court. The first (case No. 00 C.A. 149) is the appeal by Stop 26 and ESQ appeal of the trial court's July 27, 2000 judgment finding them in contempt of court and fining them $10,000 per day. The second (case No. 00 C.A. 212) is the appeal by Squire of the trial court's September 21, 2000 judgment finding him in contempt of court and fining him $1,500 and ordering him to pay Citicasters' attorney fees in proceeding on the show cause motion. The appeals have not been consolidated, but for the sake of efficiency this opinion will address both.

{¶ 27} Stop 26 and ESQ raise two assignments of error. Stop 26 and ESQ's first assignment of error states:

{¶ 28} "The trial court erred in basing the contempt order on violation of the July 21, 2000 temporary restraining order, because the trial court lacked subject matter jurisdiction to order a change in ultimate control of programming."

{¶ 29} Stop 26 and ESQ argue that the trial court did not have subject matter jurisdiction to issue the July 20, 2000 TRO. Stop 26 and ESQ argue that since the TRO was void ab initio, it could not form the basis for a contempt citation. Stop 26 and ESQ continue to maintain that this matter is within the exclusive jurisdiction of the FCC.

{¶ 30} In response, Citicasters argues that appellant's contention that the trial court lacks subject matter jurisdiction is barred by the doctrine of res judicata. Citicasters points to the resolution of that issue by the United States District Court and by this court in *State ex rel. Stop 26–Riverbend, Inc. v. Krichbaum* (Aug. 17, 2000), Mahoning App. No. 00 C.A. 153.

{¶ 31} The doctrine of res judicata consists of two related concepts— claim preclusion (historically called estoppel by judgment in Ohio) and issue

preclusion (traditionally known as collateral estoppel). *Grava v. Parkman Twp.* (1995), 73 Ohio St.3d 379, 381, 653 N.E.2d 226. Claim preclusion holds that a valid, final judgment rendered upon the merits bars all subsequent actions based upon any claim arising out of the transaction or occurrence that was the subject matter of the previous action. *Ft. Frye Teachers Assn., OEA/NEA v. State Emp. Relations Bd.* (1998), 81 Ohio St.3d 392, 395, 692 N.E.2d 140. Issue preclusion holds that a fact or a point that was actually and directly at issue in a previous action, and was passed upon and determined by a court of competent jurisdiction, may not be drawn into question in a subsequent action between the same parties or their privies, whether the cause of action in the two actions be identical or different. Id.

{¶ 32} While the merger and bar aspects of res judicata have the effect of precluding the relitigation of the same cause of action, the issue preclusion aspect prevents the relitigation, in a second action, of an issue that has been actually and necessarily litigated and determined in a prior action that was based on a different cause of action. Id. Under the rule of issue preclusion, " 'even where the cause of action is different in a subsequent suit, a judgment in a prior suit may nevertheless affect the outcome of the second suit.' Id. [*White v. Gen. Tel. Co.* (1969), 20 Ohio St.2d 108] at 112, 49 O.O.2d 435, 254 N.E.2d 10."

{¶ 33} Additionally, "once [a] jurisdictional issue has been fully litigated and determined by a court that has authority to pass upon the issue, said determination is *res judicata* in a collateral action and can only be attacked directly by appeal." *Squires v. Squires* (1983), 12 Ohio App.3d 138, 141, 12 OBR 460, 468 N.E.2d 73. In this case, the issue of the trial court's subject matter jurisdiction was fully litigated in both federal court and by this court. Therefore, Stop 26 and ESQ are precluded from litigating the issue again.

{¶ 34} Accordingly, Stop 26 and ESQ's first assignment of error is without merit.

{¶ 35} Stop 26 and ESQ's second assignment of error states:

{¶ 36} "Even if the trial court's temporary injunction was not void ab initio, the trial court erred by imposing excessive criminal contempt fines of $10,000 per day, which is in excess of any restitutionary goal and not reasonably commensurate with the gravity of the offense."

{¶ 37} Stop 26 and ESQ state that R.C. 2727.12, which provides for restitutionary fines where an injunction or restraining order is disobeyed, requires the sanction to be reasonably commensurate with the gravity of the offence. Stop 26 and ESQ argue that the trial court heard no evidence as to what financial injury, if any, was caused to appellee as a result of appellants' noncompliance with TRO. Therefore, Stop 26 and ESQ assert there was no basis in the record for

calculating a restitutionary remedy that would be reasonably commensurate with the gravity of noncompliance.

{¶ 38} In response, Citicasters makes two distinct arguments. First, Citicasters argues that appellants waived their right to appeal the sanction because they did not object to it. Second, Citicasters argues that the $10,000-per-day fine was an appropriate coercive measure.

{¶ 39} A trial court's finding of contempt will not be reversed absent an abuse of discretion. *State ex rel. Ventrone v. Birkel* (1981), 65 Ohio St.2d 10, 11, 19 O.O.3d 191, 417 N.E.2d 1249. Abuse of discretion connotes more than an error of law or of judgment; it implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140. "When applying the abuse of discretion standard, a reviewing court is not free to merely substitute its judgment for that of the trial court." *In re Jane Doe 1* (1991), 57 Ohio St.3d 135, 137–138, 566 N.E.2d 1181.

{¶ 40} Contempt has been variously classified as either direct or indirect, criminal or civil. *In re Carroll* (1985), 28 Ohio App.3d 6, 8, 28 OBR 15, 501 N.E.2d 1204. R.C. 2705.01 addresses direct contempt. It reads:

{¶ 41} "A court, or judge at chambers, may summarily punish a person guilty of misbehavior in the presence of or so near the court or judge as to obstruct the administration of justice."

{¶ 42} R.C. 2705.02, which addresses indirect contempt, provides:

{¶ 43} "A person guilty of any of the following acts may be punished as for a contempt:

{¶ 44} "(A) Disobedience of, or resistance to, a lawful writ, process, order, rule, judgment, or command of a court or officer[.]"

{¶ 45} Also, R.C. 2727.11 provides:

{¶ 46} "An injunction or restraining order granted by a judge may be enforced as the act of the court, and disobedience thereof may be punished by the court, or by a judge who granted it in vacation, as a contempt."

{¶ 47} Though the Revised Code provides statutory authority, "[t]he power of contempt is inherent in a court, such power being necessary to the exercise of judicial functions." *Denovchek v. Trumbull Cty. Bd. of Commrs.* (1988), 36 Ohio St.3d 14, 15, 520 N.E.2d 1362. The power is said to exist independently of express statutory law addressing contempt. *Cincinnati v. Cincinnati Dist. Council 51* (1973), 35 Ohio St.2d 197, 202, 64 O.O.2d 129, 299 N.E.2d 686. Since a court has the inherent power to punish contempt, it also has

the power to determine the kind and character of conduct which will constitute contempt. *State ex rel. Turner v. Albin* (1928), 118 Ohio St. 527, 535, 161 N.E. 792; *In re Ayer* (1997), 119 Ohio App.3d 571, 576, 695 N.E.2d 1180. In addition to R.C. 2705.01, direct contempt has been defined to include "conduct which brings the administration of justice into disrespect, or which tends to embarrass, impede or obstruct a court in the performance of its functions." *Denovchek*, 36 Ohio St.3d at 16, 520 N.E.2d 1362, quoting *Windham Bank v. Tomaszczyk* (1971), 27 Ohio St.2d 55, 56, 56 O.O.2d 31, 271 N.E.2d 815. For indirect contempt, "it is necessary to establish a valid court order, knowledge of the order, and violation of it." *Arthur Young & Co. v. Kelly* (1990), 68 Ohio App.3d 287, 295, 588 N.E.2d 233.

{¶ 48} In this case, Stop 26 and ESQ do not contest the fact that they did not comply with the TRO. At the July 27, 2000 contempt hearing Squire stated, "we'll admit that we have not complied with the order." Therefore, it is clear that Stop 26 and ESQ were in contempt. Their next argument goes to the propriety of the trial court's sanction for that contempt. A sanction, whether imposed for civil or criminal contempt, contains an element of punishment. *Brown v. Executive 200, Inc.* (1980), 64 Ohio St.2d 250, 253, 18 O.O.3d 446, 416 N.E.2d 610. However, courts tend to distinguish civil and criminal contempt by the character and purpose of the sanction imposed. Id.

{¶ 49} In *ConTex, Inc. v. Consol. Technologies, Inc.* (1988), 40 Ohio App.3d 94, 95–96, 531 N.E.2d 1353, the court elaborated on this distinction as follows:

{¶ 50} "The purpose of criminal contempt sanctions is to vindicate the authority of the court, [*Brown v. Executive 200, Inc.* (1980), 64 Ohio St.2d 250, 254, 18 O.O.3d 446, 449, 416 N.E.2d 610, 613], and to punish past acts of disobedience. [*Latrobe Steel Co. v. United Steelworkers of America* (C.A.3, 1976), 545 F.2d 1336, 1343]. The penalties imposed on a criminal contemnor are unconditional, *Brown, supra,* 64 Ohio St.2d at 253–254, 18 O.O.3d at 449, 416 N.E.2d at 613, and may take the shape of an absolute fine for a specific amount or a determinate period of confinement. *Latrobe Steel Co., supra,* at 1343.

{¶ 51} "The purpose of sanctions imposed for civil contempt is to coerce compliance with the underlying order or to compensate the complainant for loss sustained by the contemnor's disobedience. Punishment for civil contempt may, therefore, be either: (1) remedial or compensatory in the form of a fine to compensate the complainant for the contemnor's past disobedience; or (2) coercive and prospective, *i.e.,* designed to aid the complainant by bringing the defendant into compliance with the order, and conditional, wherein confinement may be terminated by the contemnor's adherence to the court's order. *Brown, supra.*"

{¶ 52} In addition to this common-law authority for contempt sanctions, R.C. 2705.05(A) sets forth statutory limitations. It provides:

{¶ 53} "(A) In all contempt proceedings, the court shall conduct a hearing. At the hearing, the court shall investigate the charge and hear any answer or testimony that the accused makes or offers and shall determine whether the accused is guilty of the contempt charge. If the accused is found guilty, the court may impose any of the following penalties:

{¶ 54} "(1) For a first offense, a fine of not more than two hundred fifty dollars, a definite term of imprisonment of not more than thirty days in jail, or both;

{¶ 55} "(2) For a second offense, a fine of not more than five hundred dollars, a definite term of imprisonment of not more than sixty days in jail, or both;

{¶ 56} "(3) For a third or subsequent offense, a fine of not more than one thousand dollars, a definite term of imprisonment of not more than ninety days in jail, or both."

{¶ 57} Dealing specifically with violations of a TRO, R.C. 2727.12 provides:

{¶ 58} "Upon being satisfied, by affidavit, of the breach of an injunction or restraining order, the court or judge who issued such injunction or order may issue an attachment against the guilty party who shall pay a fine of not more than two hundred dollars, for the use of the county, make immediate restitution to the party injured, and give further security to obey the injunction or restraining order. In default thereof, said party may be committed to close custody until he complies with such requirement, or is otherwise discharged."

{¶ 59} This section is not exclusive, but cumulative with R.C. 2705.05. *Pilliod v. Searles* (1927), 115 Ohio St. 694, 155 N.E. 231.

{¶ 60} Although the Revised Code sets forth caps on contempt fines, the Ohio Supreme Court has indicated disdain of attempts by the General Assembly to limit a court's ability to punish for contempt. In *Cincinnati v. Cincinnati Dist. Council 51* (1973), 35 Ohio St.2d 197, 207–208, 64 O.O.2d 129, 299 N.E.2d 686, the court observed:

{¶ 61} "It is * * * highly doubtful that the General Assembly may properly limit the power of a court to punish for contempt. Although it is conceded that the General Assembly may prescribe procedure in indirect contempt cases, the power to punish for contempt has traditionally been regarded as inherent in the courts and not subject to legislative control. * * * The Courts of Common Pleas are established by Section 1 of Article IV of the Ohio Constitution not by the General Assembly, and, hence, are co-equal branches of the government. Those

courts are vested with the judicial power of the state, which includes the power to enforce lawful orders by contempt proceedings."

{¶ 62} Previously, this court has agreed. See *Dombroski v. Dombroski* (Sept. 28, 1999), Harrison App. No. 506, 1999 WL 783975.

{¶ 63} In this case, the trial court did not abuse its discretion in imposing the $10,000-a-day fine. Appellee had advanced to appellants $1,725,000 of the $2,750,000 total purchase price. Given the sums involved, $10,000 does not seem disproportionate. Also, at the time, the court was restricted to dealing with the corporations involved. Therefore, there was no person or persons for the court to put in jail in order to coerce compliance. The only way to coerce a corporation in this instance was to levy a heavy fine. Furthermore, it was apparent that Stop 26 and ESQ were going to continue not to comply with the TRO.

{¶ 64} Accordingly, Stop 26 and ESQ's second assignment of error is without merit.

{¶ 65} Squire raises five assignments of error. Squire's first assignment of error states:

{¶ 66} "The trial court finding of guilt on one count of criminal contempt of court is based on evidence insufficient as a matter of law and it is against the manifest weight of the evidence."

{¶ 67} Squire argues that no witnesses were sworn and no evidence was admitted. Squire concludes, therefore, that there was no evidence of contempt.

{¶ 68} To the contrary, the trial court took judicial notice of Squire's previous admission that the he had not complied the TRO. As indicated under Stop 26 and ESQ's second assignment of error, this clearly constitutes contempt of court. Squire's attorney stated that they intended "to stand on the record as it's presently composed" and that the only defense was lack of jurisdiction. As indicated under Stop 26 and ESQ's first assignment of error, the trial court had jurisdiction and, therefore, it was no defense.

{¶ 69} Accordingly, Squire's first assignment of error is without merit.

{¶ 70} Squire's second assignment of error states:

{¶ 71} "The trial court's order of August 31st declining to accept attorney Squire's written plea of not guilty, denying his jury demand, rejecting his request for notice of the charges and evidence against him and, and [sic] 'requesting' attorney Debbeler to present evidence 'to demonstrate attorney Squire's role in the defiance of this court's order' denied the defendant substantive and procedural due process, equal protection, the right to confront and cross-examine adverse

witnesses, to present a defense, to the effective assistance of counsel, to a fair and impartial fact finder, and resulted in a miscarriage of justice, all in violation of the Fifth, Sixth, Eighth And Fourteenth Amendments to the United States Constitution as well as Article I §§ 10 & 16 of the Ohio Constitution."

{¶ 72}  Squire argues that the trial court erred by not accepting his written plea of not guilty.  In its August 31, 2000 judgment entry, the court did indicate that it would not accept the plea.

{¶ 73}  First, Squire's argument in this regard is moot.  At the contempt hearing, the court sustained Squire's objection to the court's refusal to accept the plea and agreed to accept Squire's plea of not guilty.

{¶ 74}  Second, for contempt proceedings, there is no requirement that the court take a formal plea.  A contempt proceeding is a special proceeding and is regarded as sui generis in that it is neither civil nor criminal.  *Denovchek v. Trumbull Cty. Bd. of Commrs.* (1988), 36 Ohio St.3d 14, 16, 520 N.E.2d 1362. Nevertheless, contempt proceedings are characterized as civil or criminal for certain purposes.  When the court seeks to punish the contemnor for a past offense to the court and to vindicate the authority of the court, the sanction is criminal in nature and certain significant constitutional safeguards attach to the contempt proceeding.  *Brown v. Executive 200, Inc.* (1980), 64 Ohio St.2d 250, 252, 18 O.O.3d 446, 416 N.E.2d 610.  However, certain statutory procedures applicable to purely criminal proceedings such as indictment, arraignment, plea, and trial by jury are not necessary procedures in cases of criminal contempt. *State v. Local Union 5760, United Steelworkers of Am.* (1961), 172 Ohio St. 75, 83, 15 O.O.2d 133, 173 N.E.2d 331, overruled as to the standard of proof required to establish criminal contempt by *Brown,* 64 Ohio St.2d at 252, fn. 1, 416 N.E.2d 610 (disaffirming any language which suggests the standard in criminal contempt is less than proof beyond a reasonable doubt).

{¶ 75}  Squire argues that the trial court erred in rejecting his jury demand.  Contempt is a petty offense within constitutional contemplation and there is no requirement for a jury trial.  *State v. Weiner* (1974), 37 Ohio St.2d 11, 13, 66 O.O.2d 6, 305 N.E.2d 794; *Local Union 5760,* supra.

{¶ 76}  Squire argues that he did not receive adequate notice of the contempt charge.  At the July 27, 2000 contempt hearing dealing with Stop 26 and ESQ, the court made it clear to Squire that he too would be the subject of contempt.  Also, a show-cause order was filed that same day naming Squire specifically and individually.  The court deferred the matter until September 21, 2000, giving Squire adequate notice and time to prepare a defense.

{¶ 77}  Squire takes issue with Citicasters' counsel presenting the case for contempt against him.  Despite Squire's characterization to the contrary, Citi-

casters' attorney did not "prosecute" the contempt. Citicasters' attorney merely recited the procedural background and history of the case as it stood in the record. The court took judicial notice of those facts pertinent to the issues before it, which it was entitled to do. *Myers v. State* (1889), 46 Ohio St. 473, 22 N.E. 43.

{¶ 78}  Accordingly, Squire's second assignment of error is without merit.

{¶ 79}  Squire's third assignment of error states:

{¶ 80}  "The court below lack subject matter jurisdiction and the finding of contempt is void *ab initio.*"

{¶ 81}  For the reasons stated in Stop 26 and ESQ's first assignment of error, this assignment of error is without merit.

{¶ 82}  Squire's fourth assignment of error states:

{¶ 83}  "The defendant's failure to immediately comply with the temporary restraining order does not constitute direct criminal contempt of court."

{¶ 84}  Squire argues that this case does not constitute criminal contempt because he was never disrespectful to the court. Additionally, Squire states that he ultimately did comply with the TRO when it appeared that his other legal remedies had proven unsuccessful.

{¶ 85}  Squire's conduct did constitute criminal contempt. The court sought to punish Squire for his past failures to comply with the TRO and to vindicate the authority of the court. Squire was required to immediately comply with the TRO, which he did not do. He was not entitled to defer compliance until he exhausted all other legal remedies.

{¶ 86}  Accordingly, Squire's fourth assignment of error is without merit.

{¶ 87}  Squire's fifth assignment of error states:

{¶ 88}  "The trial court's actions in this case denied the defendant due process of law under the state and federal Constitution in that they were arbitrary and capricious, and because they evidence an attitude of enmity, malice and ill will against the person of the defendant."

{¶ 89}  Squire argues that the court improperly issued the TRO. However, the TRO is an interlocutory order and not immediately subject to appellate review as this court has already twice indicated.

{¶ 90}  Squire also argues that the court was partial towards Citicasters and that its rulings were motivated by a spirit of malice and ill will against Squire. However, Squire fails to point to any evidence in support of these allegations. In contrast, the record is replete with comments made by the court

**550**

expressing respect for Squire and an understanding of the difficult situation Squire put himself in.

{¶ 91}   Accordingly, Squire's fifth assignment of error is without merit.

{¶ 92}   The judgment of the trial court is hereby affirmed.

Judgment affirmed.

VUKOVICH and WAITE, JJ., concur.