961 A.2d 665

**ROYAL INVESTMENT GROUP, LLC, et al.**

v.

**Don C. WANG.**

**No. 2311, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Dec. 4, 2008.

**410**

**414**

416

Amy C.H. Grasso and Maury S. Epner (Miller & Canby, Ctd, on the brief), for appellant.

Adam M. Spence (Spence & Buckler PC on the brief), of Towson (Quinn O'Connell, Jr., Desiree C. Hensley on the brief), Washington, for appellee.

Argued before WOODWARD, GRAEFF, MOYLAN, and CHARLES E., JR., (Retired, Specially Assigned), JJ.

GRAEFF, J.

This lawsuit arises from a dispute between Don C. Wang, appellee, and Sean Shahparast, the sole member of Royal Investment Group, LLC, (collectively, "Royal"), appellants, over their negotiations for Royal to purchase from Mr. Wang a house and real property located at 5281 Goldsboro Road in Montgomery County ("the Property"). Negotiations broke down, and the parties did not proceed to settlement. After Mr. Wang advised Royal that the contract was terminated and that Royal had no authority to enter the Property, Royal proceeded to demolish the existing home on the Property, and, during the ensuing lawsuit, Royal spent over $700,000 to build a new home on the Property.

After a seven day bench trial, the circuit court rejected Royal's request for specific performance on the real estate

contract and issued a declaratory judgment, finding that Royal breached the contract when it failed to proceed to settlement pursuant to the terms of an addendum dated June 16, 2005. It further found Royal liable for trespass, and it denied Royal's claim for unjust enrichment stemming from improvements to Mr. Wang's property.

Upon learning of the circuit court's order, Mr. Shahparast went to the Property and removed cabinets he had installed from the Property. As a result of these actions, the circuit court held Royal, through its President, Mr. Shahparast, in constructive civil contempt. The court imposed a sanction of incarceration, subject to a purge provision of $75,000, the replacement value of the removed cabinets.

On appeal, Royal presents five issues for our review, which we have rephrased as follows:

1. Did the trial court err in finding that the June 16 addendum to the contract for the Property satisfied the Statute of Frauds?

2. Did the trial court err in denying Royal's claim for restitution for improvements made to the Property?

3. Did the trial court err in finding Royal liable for trespass?

4. Did the trial court err in finding Mr. Shahparast in contempt?

5. Did the trial court err in awarding Mr. Wang $179,907.60, in attorney's fees?

For the reasons set forth below, we affirm the judgments of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 23, 2001, Mr. Wang, the owner of the Property, received a notice informing him that Montgomery County had condemned the house located on the Property and found it unfit for human habitation due to multiple housing code violations. The letter included a list of violations that needed to be repaired before the condemnation notice would be lifted.

Following receipt of this letter, Mr. Wang vacated the house on the Property.

On January 23, 2002, the Department of Housing and Community Affairs sent Mr. Wang a second letter directing him "to either correct all deficiencies listed in the Condemnation Notice, or demolish the dwelling. . . ." The evidence indicated that the rooms in the Property were filled with trash, which was piled up almost to the ceiling.

In 2004, Mr. Wang decided to sell the Property. Mr. Wang made $18,000 a year, and he needed money. On December 7, 2004, Royal offered Mr. Wang $680,000 to purchase the Property but, due to multiple offers, the offer was raised to $700,000. On December 16, 2004, the parties entered into a contract, which required a $25,000 deposit and provided a settlement date of February 22, 2005. The contract further provided that time was of the essence and that, if either party defaulted by failing to perform "any act" in the contract by a prescribed date, the non-defaulting party, upon written notice to the defaulting party, could declare the contract null and void. Pursuant to the contract: "Once signed, the terms of this Contract can only be changed by a document executed by all parties." An addendum signed on the same day provided that the Property would be sold in "as is" condition, and that "[t]he property shall be delivered free and clear of trash and debris and broom clean."

On December 22, 2004, Mr. Wang signed an addendum to the contract that was drafted by Royal. The addendum provided that: (1) Mr. Wang would remove all trash from the house by January 21, 2005; (2) settlement would occur on April 29, 2005; and (3) Royal would be permitted to perform "any repair/construction at buyer's risk & expense." Royal believed that this language gave it the right to demolish the home and begin construction of a new home prior to settlement, whereas Mr. Wang believed the clause allowed only minor cosmetic repairs. The addendum further provided that, "[i]f the buyer does not go to the scheduled settlement 4/29/05, then all repair/construction belong to the seller." This adden-

dum, as well as each subsequent addendum, stated that it was ratified as part of the contract and "[a]ll other terms of the contract remain in full force and effect." Mr. Wang failed to remove the trash from the house within thirty days as required by the addendum.

Mr. Shahparast mailed Mr. Wang a letter dated January 24, 2005, expressing concern because the trash had not been removed from the house, and he had hired contractors who could not begin work because of the trash. As a result of this letter, on February 11, 2005, the parties executed another addendum providing as follows: (1) the price would be lowered to $660,000; (2) the settlement date was extended to July 30, 2005; and (3) Mr. Shahparast assumed responsibility for removing the trash from the house. Mr. Shahparast attempted to schedule contractors to work on the Property, but, he claimed that, because an inoperative car was left on the Property, the contractors refused to begin work due to the potential liability if they damaged the car. Royal sought to modify several items of the contract in order "not to null and void" the contract.

On March 8, 2005, the parties executed another addendum with the following terms: (1) the price of the Property was reduced to $625,000; (2) Mr. Wang was to remove the car by March, 17, 2005, and "time is [of] the essence"; (3) settlement changed to August 3, 2005; and (4) Royal would assume responsibility for removing the trash. The addendum provided: "All other of the terms of the contract remain in full force and effect." Mr. Wang failed to remove the car by the agreed upon date because he was unable to locate the title to the car.

In a letter dated June 9, 2005, Mr. Shahparast wrote to Mr. Wang's real estate agent expressing frustration that Mr. Wang had breached his obligation under the contract to remove the car from the Property by March 3, 2005. Royal advised that "until Mr. Wang agrees to pay for our loss of time and 30% increase in construction cost Royal Investment Group will not release him for the breach of his obligation under the term of December 12, 2004, and the latest adden-

dum of March 08, 2005." The letter further advised that Royal was willing to release Mr. Wang from his breach under the following conditions:

1. Settlement date of no later than December 16, 2005, or soon after the car is remove [sic] and seller is able to schedule all contractors.

2. Contract price to be reduced to $600,000.

3. Removal of the car by no later than June 18, 2005. (Time is being of the essence).

In response to this letter, Mr. Wang's agent contacted Mr. Wang and encouraged him to follow through on the contract. On June 16, 2005, with Mr. Wang at her office, Mr. Wang's agent spoke with Mr. Shahparast on the phone. Mr. Wang's agent testified that, during this conversation, the parties agreed to new terms, including a reduction in the contract price and an August 31, 2005, settlement date.[1] Pursuant to this agreement, Mr. Wang signed another addendum to the contract ("the June 16 addendum") setting out the terms agreed upon during the phone conversation. The addendum provided as follows:

It is understood by the phone conversation between the buyer and [Mr. Wang's] agent, Alice Wang (not related), the following terms are agreed:

(1) reduce the contract price to $600,000

(2) settlement date to August 31, 2005, (Wednesday)

(3) The car on the lawn (drive way) of the property to be removed by the seller by 8:00 PM, June 18, 2005 (Saturday)

Mr. Wang's agent informed Mr. Shahparast's agent that Mr. Wang signed the addendum, and she faxed the addendum to Mr. Shahparast's agent.

---

1. Royal points to the testimony of Mr. Shahparast, its agent, that Royal never agreed to an August settlement date. The trial court, however, found evidence of an oral agreement. This factual finding will be discussed in more detail, *infra.*

That same day, after borrowing money from his real estate agent, Mr. Wang had the car towed off the Goldsboro property. Mr. Wang's agent called Mr. Shahparast's agent, informing her that Mr. Wang had removed the car, and Mr. Shahparast's agent told Mr. Wang's agent that Mr. Shahparast signed the addendum, but she did not have a copy of it yet. Mr. Wang never received a signed copy of this addendum. Mr. Shahparast stated in a deposition that he never signed the June 16 addendum, but a signed, undated copy of the addendum was later discovered in the possession of the title company.[2]

On June 18, 2005, Royal requested that the settlement date be changed to December 15, 2005. He sent a proposed addendum that delayed settlement until December but stated that "[a]ll other terms in the amended addendum dated June 16, 2005, remain in full force." Mr. Wang agreed to extend the settlement date to December only if Royal would pay the $1,750 in property taxes that were due in September, as well as interest on the proceeds of the sale as if "we settle[d] on August 31st as the buyer told me on 6/16." [3] Royal refused to pay the Property taxes and interest. On August 4, 2005, Mr. Wang communicated another offer to change the settlement date to December 15, 2005, with a sales price of $625,000. Alternatively, he restated the price and settlement date included in the June 16 addendum of $600,000 with a August 31, 2005, settlement date. Royal responded by proposing a November 15, 2005, settlement date at $600,000, or a December 15, 2005, settlement date at $605,000. Mr. Wang rejected these proposed changes to the price and settlement date. The parties did not settle on August, 31, 2005.

---

**2.** Mr. Shahparast testified at trial that, in mid-September, he signed and faxed the June 16, 2005, addendum to Gemini Title when requesting preparation of the settlement statement for an October 21, 2005, settlement.

**3.** Mr. Wang testified that he made $18,000 a year and, after paying his expenses, sometimes resorted to "dumpster diving" to get food.

On September 1, 2005, Mr. Wang's attorney mailed a letter to Mr. Shahparast, advising that it was clear that Royal had no intention of proceeding to settlement under the terms of the contract and that Mr. Wang was declaring Royal in default of the contract. The letter requested that Mr. Shahparast's agent release the $25,000 deposit to Mr. Wang, and it also stated that "[a]ny and all existing offers and/or counteroffers relating in any manner to the Contract, are hereby withdrawn if made by the Seller, and declined if made by the Purchaser." It further stated that Mr. Wang was reviewing his legal rights regarding Royal's actions in cutting and removing Mr. Wang's valuable trees, which was not authorized by the contract and diminished the value of the Property.

On September 12, 2005, and on September 21, 2005, Mr. Wang's attorney wrote letters to Royal reasserting Mr. Wang's position that Royal was in default of the contract, but offering to reinstate the contract for an increased price, and further proposing a new settlement date. The September 21, 2005 letter stated that

> until such time as a written agreement has been entered into by Mr. Wang and Royal reinstating the Original Contract, or a new contract is executed by the Parties, Royal has no authority to enter onto Mr. Wang's property. Mr. Wang will hold Royal strictly liable for any further damage to his property.

On September 21 and 23, 2005, Royal wrote letters to Mr. Wang's attorney setting forth its position that Mr. Wang was in default of the contract. The September 21 letter stated: "My position is very clear. The contract price is for $600,000 as it was agreed and signed by Mr. Wang and my Company and any other proposal will be resolved by the Court."

On October 3, 2005, Mr. Wang received a phone call around 8:00 a.m. from his attorney, informing Mr. Wang that, as he drove by the Property on his way to work, heavy equipment was demolishing the house located on the Property. On October 7, 2005, four days after the house was demolished, the county issued a demolition permit to Royal Investment Group

and Mr. Shahparast to demolish a single family dwelling on the Property. On October 13, 2005, the county issued Royal Investment Group a building permit for a single family dwelling. Royal's application for the building permit, dated July 12, 2005, indicated that the work was authorized by Mr. Wang. There was, however, no authorization by Mr. Wang.

Mr. Wang made at least two trips over the next few days to speak with the County Attorney about the situation. During the second trip, the County Attorney inquired whether Mr. Wang wanted the county to issue a stop work order. Mr. Wang responded that he would let Mr. Shahparast "go ahead and build the house, and then he was going to walk up to the front door in essence and ask for the keys."

On October 11, 2005, after Royal demolished Mr. Wang's house, Royal scheduled settlement for October 21, 2005. Despite Royal's claim in discovery that it never signed the June 16 addendum, Mr. Shahparast forwarded to the settlement company a copy of the contract with all accompanying addenda, including the June 16 addendum signed by Mr. Shahparast. The settlement documents prepared had a sale price of $600,000, which was the price listed on the June 16 addendum, the only contract addendum with a $600,000 price. On October 11, 2005, Royal advised counsel for Mr. Wang that it had scheduled settlement for October 21, 2005.

On October 13, 2005, Mr. Wang's attorney responded to the letter, stating that there had been no change in Mr. Wang's stated position that Royal was in default on the contract, that Royal had no authority to enter on Mr. Wang's property, and that Royal would be strictly liable for further damages. The letter further advised that, without waiving any claims Mr. Wang had against Royal, Mr. Wang would agree to reinstate the terms of the original contract if the purchase price was amended to $750,000.

Mr. Wang did not appear at the October 21, 2005 settlement unilaterally scheduled by Royal. Royal nevertheless proceeded to build a new home on the Property, expending from April, 2005, until July 1, 2007, a total of $728,842.44.

On May 23, 2006, Royal filed suit in the Circuit Court for Montgomery County. On August 18, 2006, Royal filed an amended complaint seeking: (1) specific performance from Mr. Wang on the contract of sale for the Property; (2) ancillary money damages in the amount of $800,000; and (3) breach of contract for which Royal requested money damages in the amount of $2,500,000. Royal alleged that the damages resulted from lost profits, forfeited constructions costs, attorney's fees and other similar costs.

On October 18, 2006, Mr. Wang filed a counterclaim seeking a declaratory judgment that Royal breached the December 16, 2004 contract, modified by "the 3rd Amendment" dated June 16, 2005. Mr. Wang further alleged claims for conversion based on Royal demolishing his home on October 3, 2005, trespass after September 1, 2005, by demolishing his home and building another home on his property, and ejectment. Mr. Wang also filed a third party claim against Mr. Shahparast and Homa Ravanbaksh, Mr. Shahparast's wife, which alleged "slander of title" based on the application for a building permit where they allegedly swore that they were the owners of the Property.

On April 20, 2007, Mr. Wang amended his counterclaim against Royal, Mr. Shahparast, and Ravanbaksh. Count I requested entry of a declaratory judgment alleging that there was a lack of consideration for the sale of real property. Count II requested a declaratory judgment alleging that the real estate contract is null and void based on Royal's failure to settle in a timely manner. Count III, conversion, requested $1,000,000 in punitive damages and $700,000 in compensatory damages based on Royal's cutting down and removing most of the trees on the Property. Count IV, trespass to property, requested $1,000,000 in punitive damages and $700,000 in compensatory damages based on Royal's trespass onto the Property, which included demolishing the existing house situated on the Property and building a new house. Count V, fraud/fraud in the inducement, requested $700,000 in damages, alleging that Mr. Wang lowered the contract price of the house in reliance on Mr. Shahparast's fraudulent statements

that he incurred substantial expenses due to the delay in completing the sale of the Property. Count VI, unjust enrichment, requested one half of the market value of the residence built on the Property. Count VII, slander of title, requested $700,000 in damages based on Mr. Shahparast and Ravanbaksh's false statements claiming ownership of the Property, which resulted in Montgomery County issuing a demolition permit, and contractors believing Mr. Shahparast owned the Property. On July 12, 2007, Mr. Wang filed another motion to amend the counterclaim, requesting permanent injunctive relief to prevent Mr. Shahparast from "any further trespass or interference" with the Property.

Royal continued building a home on Mr. Wang's property until approximately ten days before the trial began. It incurred 97% of its expenditures after September 1, 2005, when Mr. Wang advised that the contract was terminated.

On October 3, 2007, following a bench trial, the circuit court issued a written opinion ruling primarily in Mr. Wang's favor. The court denied Royal's claims for specific performance, money damages, *quantum meruit*, and unjust enrichment. With respect to Mr. Wang's request for a declaratory judgment, the court found that the June 16 addendum created a new, enforceable contract, which was breached by Royal's failure to settle on August 31, 2005. With respect to Mr. Wang's trespass and ejectment claim, the trial court found that Royal trespassed on Mr. Wang's property, awarding Mr. Wang $45,600, and granting possession of the Property to Mr. Wang. The trial court entered judgment in Royal's favor on Mr. Wang's claim for conversion and slander of title.

The court mailed a copy of its order directly to the attorneys for both parties before the order was docketed by a court clerk. Royal's trial attorney received the opinion and order on Monday, October 8, 2007, but he did not read the opinion immediately or inform Mr. Shahparast about the opinion. He spent most of the day at an event organized by the local bar association.

After Mr. Wang's attorney received the order and opinion, he contacted a contractor to change the locks of the house located on the Property. The contractor arrived at the house on October 8, 2007. He gained access through a back door and determined that he would need a locksmith to change the locks. While he waited for the locksmith to arrive, he inspected the house and observed installed cabinetry in the kitchen, master bathroom, library, above a wet bar, in an alcove between the family and living room, and in a butler's pantry. He did not observe any uninstalled cabinets. The locksmith arrived to begin replacing the locks, and, soon thereafter, Mr. Shahparast and his wife arrived.

Mr. Shahparast interrupted their work and informed them that it was Mr. Shahparast's house and the contractor and the locksmith had no right to change the locks. In an effort to resolve the situation, the contractor called one of Mr. Wang's attorneys, Quinn O'Connell, Esq., and explained the situation to him. As a result, at approximately 11:00 a.m., Mr. O'Connell traveled to the Property and provided Mr. Shahparast with a copy of the declaratory judgment, the order, the opinion, and the cover letter, and he informed Mr. Shahparast that Mr. Shahparast was trespassing. Mr. O'Connell specifically "highlighted" the trial court's ruling regarding possession of the Property, the trespass claim, and Royal's denied claim for specific performance.

Mr. Shahparast called his attorney several times, but initially he was unsuccessful in contacting him. Mr. Shahparast then called a personal friend, who was an attorney but was not involved in the case. Because the friend was not representing Mr. Shahparast, he informed Mr. Shahparast that he "could not respond to case-specific questions," but he would "talk in generalities." The friend checked the judiciary website to determine if the order given to him by Mr. O'Connell had been docketed, and, upon finding no docketed order, informed him that "orders had to be docketed for enforcement." Mr. Shahparast's friend also explained his understanding of the difference between fixtures and personal property, informing Mr. Shahparast that he could take personal property, but he could

not remove fixtures from the Property. After speaking with his friend, Mr. Shahparast spoke to his attorney on the case. Mr. Shahparast asked whether the order was enforceable even though it had not been docketed and whether he could reenter the house and remove the cabinets. His attorney responded that he "simply [did] not know." [4]

The police arrived, and Mr. O'Connell provided the police with the order and other documents, but the police refused to enforce the circuit court's order preventing Mr. Shahparast from trespassing on the Property because the order was not certified. Mr. O'Connell and Mr. Shahparast agreed to maintain the "status quo" until the court opened the next day.[5] Mr. Shahparast agreed not to reenter the house until this dispute was resolved the next day.

Mr. O'Connell contacted a security company and arranged for a security guard to provide "24–hour coverage to have someone observe the property." While Mr. O'Connell waited for the security guard to arrive, Mr. Shahparast returned and briefly spoke to Mr. O'Connell, asking what he was doing. Mr. Shahparast then left. He returned again in work clothes, briefly spoke with Mr. O'Connell, and then walked to a side street next to Mr. Wang's property. Soon thereafter, Mr. O'Connell observed Mr. Shahparast drive into the driveway of the Property and enter the side door.

The security guard arrived at approximately 5:30 p.m. and photographed Mr. Shahparast, and a group of workers, removing cabinets from the Property and loading them into a truck.[6] After the truck was filled with cabinets, it departed and

---

4. The trial court concluded that Mr. Shahparast waived his attorney-client privilege at the contempt hearing regarding his discussions with his trial attorney pertaining to his ability to reenter the Property.

5. These events occurred on Columbus Day, and the circuit court was closed due to the holiday.

6. The circuit court found that Mr. Shahparast and several workmen "unscrewed from the walls of the home" installed cabinets and removed them.

returned empty a short time later. The workers loaded the truck seven times between 5:30 p.m. and 8:00 p.m.

The security guard, who was originally taking pictures from the other side of the street, crossed the street to take additional pictures and Mr. Shahparast reacted by "flailing his arms" and "using profanity." Mr. Shahparast taunted the security guard, asking: " 'What are you going to do about it?' " The security guard took a "defensive stance, because it looked like [Mr. Shahparast] was actually going to try to attack." Instead, Mr. Shahparast "backed off," and resumed "yelling profanities." As the truck departed for the last time, Mr. Shahparast gave the security guard "the middle finger."

The contractor inspected the house two days later. Upon inspection, all the cabinets had been removed except for those located in the library.

Mr. Wang filed a petition to hold Mr. Shahparast in contempt, which was docketed on December 12, 2007. On March 13 and 17, 2008, the circuit court presided over a contempt hearing. Several witnesses testified, including the contractor who inspected the house. The contractor testified, based upon a receipt, that Mr. Shahparast paid $59,850 for the cabinetry in the house, but the contractor, who was qualified as an expert, indicated that he was unable to obtain such a low price for comparable quality cabinets. The contractor estimated that the installed cabinetry was valued at $75,000. After hearing the evidence, the circuit court, in a ruling from the bench, found Mr. Shahparast in contempt of the court's order. On March 26, 2008, the circuit court filed a written opinion finding Mr. Shahparast "guilty of constructive civil contempt for willful violation on October 8, 2007, of an Order of this Court dated October 3, 2007." The trial court sentenced Mr. Shahparast to a 59 day period of incarceration, but included as a purge provision the payment to Mr. Wang of $75,000.

On February 4, 2008, the trial court heard arguments and received evidence, including the testimony of an expert witness, regarding Mr. Wang's claim for attorney's fees based on

the fee-shifting provision in the real estate contract. The trial court, in a lengthy opinion, awarded $179,907.60 in attorney's fees. This appeal followed.

## STANDARD OF REVIEW

In a case tried without a jury, "the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8–131(c). Under the clearly erroneous standard, " 'we must consider the evidence in the light most favorable to the prevailing party and decide not whether the trial judge's conclusions of fact were correct, but only whether they were supported by a preponderance of the evidence.' " *City of Bowie v. Mie Properties, Inc.,* 398 Md. 657, 676–77, 922 A.2d 509 (2007) (quoting *Colandrea v. Wilde Lake Cmty. Ass'n,* 361 Md. 371, 394, 761 A.2d 899 (2000)). With respect to legal conclusions, however, an appellate court " 'must determine whether the lower court's conclusions are legally correct....' " *White v. Pines Community Improvement Ass'n, Inc.,* 403 Md. 13, 31, 939 A.2d 165 (2008) (quoting *YIVO Institute for Jewish Research v. Zaleski,* 386 Md. 654, 662, 874 A.2d 411 (2005)).

## DISCUSSION

### I.

### Statute of Frauds

The trial court ruled that the June 16, 2005, contract addendum was a new contract between the parties, which was breached by Royal's failure to settle on August 31, 2005. Accordingly, the circuit court entered a declaratory judgment that Mr. Wang was the owner of the Property, that Mr. Wang was entitled to the deposit of $25,000, and that Royal was not

entitled to specific performance of the contract or damages for breach of the contract.

With respect to Royal's argument that it did not sign the June 16, 2005, addendum, and therefore the addendum did not satisfy the Statute of Frauds, the trial court framed the issue as follows:

> The issue is whether the buyer, Royal, is prohibited from claiming a violation of the Statute of Frauds in an alleged June 16 modified contract when the buyer orally accepted the seller's proposal without delivery of a written acceptance, the seller declared a default on September 1, and the buyer delivered a signed acceptance after September 1, 2005, with a settlement date of August 31, 2005, to his title company for the buyer's proposed settlement in late October, 2005.

In analyzing the pertinent facts, the court found that Royal orally agreed to the terms in the June 16, 2005, addendum. The court did not resolve when Royal signed the addendum, either on June 16, 2005, as alleged by Mr. Wang, or later in the fall, as alleged by Royal. Rather, it determined that the issue was "of no moment" because there was never a delivery of an addendum actually signed by Royal accepting the terms of the June 16, 2005, proposal *prior* to Mr. Wang's declaration of default on September 1, 2005. The court found that, without a signed written acceptance, the contract could not be enforced pursuant to the Statute of Frauds.

The court then noted, however, that "this tortured trail of facts takes another turn."

> The buyer claimed at trial he signed the June 16 Addendum in mid-September 2005 after Wang's lawyer declared a default on September 1, 2005, but no signature date for the buyer appears on the signed Addendum. He testified at trial he delivered the Addendum signed by both parties to Gemini Title Company to prepare settlement papers for October 21, 2000. Claiming to have forgotten about the

signing and delivery, he testified he discovered the Addendum at the title company in the early summer of 2007.

\* \* \*

Was the buyer's lack of delivery of the signed June 16 Addendum acceptance cured by the after September 1 delivery to Gemini Title Company of the signed acceptance so as to create an enforceable June 16 contract with a settlement date of August 31, 2005? *Williston* says "yes" and the Court agrees for the following reasons.

\* \* \*

In the court's view, delivery by Royal of the signed June 16 Addendum to Gemini Title Company in October 2005, puts it beyond the power of Royal to prevent its use as evidence and establishes an enforceable June 16, 2005, contract Addendum, satisfying the Statute of Frauds. See Defendant's Exhibit 35, providing an additional writing confirming on September 21, 2005, the contract between the parties. Under the facts of this case the Statute of Frauds is not a bar to the enforceability of the June 16 contract Addendum. The reasoning follows Maryland case law where an admission at trial of the contract terms by the party to be charged satisfies the Statute of Frauds.

Royal argues that the trial court erred in concluding that the June 16, 2005, addendum reflected a binding contract. First, it argues that the evidence does not support the trial court's conclusion that there was an oral agreement between the parties. Second, it contends that the addendum, which it alleges was signed months later, did not satisfy the Statute of Frauds because the addendum did not constitute the expression of a contract. Mr. Wang counters that the trial court correctly found that Royal orally agreed to the terms of the June 16 addendum, and that the signed addendum satisfied the Statute of Frauds.

We agree with the trial court and hold that the June 16 addendum constituted evidence of an enforceable contract

between the parties. Accordingly, Royal cannot rely on the Statute of Frauds to prevent enforcement of that contract.

 "Creation of a contract requires an offer by one party and acceptance by the other party." *Cochran v. Norkunas*, 398 Md. 1, 23, 919 A.2d 700 (2007). "Acceptance of an offer is requisite to contract formation, and common to all manifestations of acceptance is a demonstration that the parties had an actual meeting of the minds regarding contract formation." *Id.* " '[I]n other words, to establish a contract the minds of the parties must be in agreement as to its terms.' " *Mitchell v. AARP Life Ins. Program, New York Life Ins. Co.*, 140 Md.App. 102, 117, 779 A.2d 1061 (2001) (quoting *Safeway Stores, Inc. v. Altman*, 296 Md. 486, 489, 463 A.2d 829 (1983)).

We shall begin by dispensing with Royal's claim that the trial court erred in finding that an oral contract existed between Royal and Mr. Wang. This factual finding, although the subject of some conflicting evidence, was supported by the record and was not clearly erroneous.

 Mr. Wang's agent testified that, on June 16, 2005, Mr. Shahparast and Mr. Wang agreed to the terms of the addendum over the phone. The agreed upon terms included reducing the contract price to $600,000 and providing for a settlement date of August 31, 2005. Royal's acceptance of the terms is reflected in the notes made by Mr. Wang's agent, which the court found "credible." Royal's oral acceptance was further corroborated by the language of the addendum itself, which provided that "[i]t is understood by the phone conversation between the buyer" and Mr. Wang's agent that the listed terms were agreed upon. The trial court further noted that, on September 21, 2005, after Mr. Wang declared Royal in default of the contract, Royal wrote a letter stating that the "contract price is $600,000 as was agreed and signed by Mr. Wang and my company." The June 16 amended contract was the only contract for $600,000, and the only contract calling for an August 31, 2005, settlement. Thus, there was evidence to support the trial court's finding that there was an oral agreement on June 16, and the trial court's finding to that effect

was not clearly erroneous.[7]

■ Next, we turn to Royal's contention that the signed addendum did not satisfy the Statute of Frauds. The trial court's ruling, that a writing signed after an oral agreement satisfied the Statute of Frauds, was a legal conclusion that we will review *de novo.*

■ The Statute of Frauds requires that, for a contract for the sale of land to be enforceable, there must be a writing signed by the party or its agent. Pursuant to Maryland Code (2003 Repl.Vol.), § 5–104 of the Real Property Article:

No action may be brought on any contract for the sale or disposition of land or of any interest in or concerning land unless the contract on which the action is brought, or some memorandum or note of it, is in writing and signed by the party to be charged or some other person lawfully authorized by him.

As the Court of Appeals explained, "[t]o render a contract enforceable under the statute of frauds, the required memorandum must" meet the following criteria:

(1) a writing (formal or informal);

(2) signed by the party to be charged or by his agent;

(3) naming each party to the contract with sufficient definiteness to identify him or his agent;

(4) describing the land or other property to which the contract relates; and

(5) setting forth the terms and conditions of all the promises constituting the contract made between the parties.

*Beall v. Beall,* 291 Md. 224, 228–29, 434 A.2d 1015 (1981).

Here, there was an addendum signed by both parties providing for a $600,000 price and a settlement date of August 31,

---

7. Although Mr. Shahparast testified that Royal never agreed to all the terms of the addendum, the above evidence contradicted that testimony, and the trial court was free to reject Mr. Shahparast's testimony as incredible. *See Loyola Federal Sav. Bank v. Hill,* 114 Md.App. 289, 307, 689 A.2d 1268 (1997) ("[T]he trial judge may believe or disbelieve, credit or disregard, any evidence introduced . . . .").

2005. There was, however, no date next to Royal's signature. Thus, the question concerns the timing of the requisite writing to satisfy the Statute of Frauds.

In *Salisbury Building Supply Co. Inc. v. Krause Marine Towing Corp.*, 162 Md.App. 154, 162–63, 873 A.2d 452 (2005), we held that a memorandum signed *before* the contract was executed will satisfy the writing requirement of the Statute of Frauds. Although not expressly deciding whether a writing made *after* an oral contract satisfied the Statute of Frauds, we noted the general rule that a memorandum satisfying the Statute of Frauds may be made *before or after* the making of the contract. *Id.* at 161–62, 873 A.2d 452. *Accord* 10 RICHARD A. LORD, WILLISTON ON CONTRACTS § 29:5, at 440 (4th ed. 1999) ("It is commonly said that a memorandum may be made at any time subsequent to the making of the contract and prior to the bringing of the action."); 4 CAROLINE N. BROWN, CORBIN ON CONTRACTS § 22.8 (Rev. ed. 1997) ("Any writing which actually authenticates the existence and terms of a contract made by the party to be charged and which is signed by that party is sufficient to satisfy the statute [of frauds] without regard to the time when the writing was made and signed."); RESTATEMENT (SECOND) OF CONTRACTS § 136 (1981) ("A memorandum sufficient to satisfy the Statute may be made or signed at any time before or after the formation of the contract."); 2 FARNSWORTH ON CONTRACTS § 6.7 (3rd ed. 2004) ("The memorandum may be made either before or after the formation of the contract.").

Although generally accepting this legal concept, the crux of Royal's argument is that the subsequently signed addendum in this case does not satisfy the Statute of Frauds because Mr. Shahparast testified that it was executed after the settlement date, after a breach of the contract, and, therefore, it was not made as an expression of the contract. We find this argument unavailing.

Initially, it is not clear that, in fact, the addendum was signed after the settlement date. The trial court did not resolve the factual issue whether Mr. Shahparast signed the

agreement after the breach, as he alleged, or on June 16, 2005, as alleged by Mr. Wang. Rather, the trial court found that the date the writing was signed was irrelevant because the contract was formed on June 16, 2005, when Mr. Shahparast agreed, in a phone conversation with Mr. Wang's agent, to the terms of the contract.

We agree with the trial court that, although the signed addendum was necessary to satisfy the Statute of Frauds, it was not the contract, but merely evidence of the oral contract. *See Millikan v. Simmons*, 244 N.C. 195, 93 S.E.2d 59, 62 (1956) ("It is not necessary, therefore, that a writing be signed at the time a contract is made. 'The writing is not the contract; it is the party's admission that the contract was made.' "). As noted in WILLISTON ON CONTRACTS, *supra*, § 29:5, at 448–49:

> When a memorandum exists, it is often said to relate back to the time when the oral contract was made, but it is not necessary to resort to the fiction of relation back to explain the situation. It is the oral contract which is enforced, but it can be enforced only when the Statute has been satisfied.
>
> * * *
>
> ▉▉▉ The Statute does not require its satisfaction by a writing to be made simultaneously with the agreement, and it is unnecessary to make the fictitious assumption that it is in fact simultaneous in a case where it is not. Satisfaction of the Statute by the making of the memorandum does, however, result in the previously unenforceable oral agreement becoming binding, and since it is that contract which becomes binding, it should be as of the date of the oral contract; and there seems to be no limit, except perhaps that imposed by the Statute of Limitations, upon the power of a party to an oral contract at any time to make a memorandum binding upon himself. (Footnotes omitted.)

Because the contract to be enforced here is the oral contract agreed to on June 16, 2005, and the signed addendum is merely evidence of that contract, it is irrelevant whether the

writing was made after a breach of the contract. *See* RE-STATEMENT (SECOND) OF CONTRACTS, *supra*, § 136, cmt.b ("There is no requirement that the memorandum be made contemporaneously with the contract. It may be made even after breach or repudiation."); *Bird v. Munroe*, 66 Me. 337, 340, 346–47 (1877) (holding that a memorandum signed after a breach of contract confirming an earlier oral agreement satisfied the Statute of Frauds); *Teel v. Harlan*, 199 Okla. 268, 185 P.2d 695, 697 (1947) (noting that "the memorandum of the contract required by the Statute of Frauds may be made subsequently to the making of the contract itself ... and even after an alleged breach has occurred.").

As this Court has recognized, "the purpose of the Statute of Frauds 'is the prevention of successful fraud by inducing the enforcement of contracts that were never in fact made. It is not to prevent the performance or the enforcement of oral contracts that have in fact been made.'" *Collins v. Morris*, 122 Md.App. 764, 773–74, 716 A.2d 384 (1998) (quoting CORBIN ON CONTRACTS, *supra* § 22.1 at 703). *Accord Salisbury* 162 Md.App. at 162, 873 A.2d 452 (noting the statute's purpose of preventing fraud). A signed writing protects against a fraudulent allegation of an oral contract, and it prevents the signor from preventing enforcement of the oral contract pursuant to the Statute of Frauds, regardless of when the writing was signed.

Thus, we hold that the Statute of Frauds is not a bar to enforcing an oral contract when there is a subsequent writing confirming the agreement, even if the writing is signed after a breach of the agreement. The June 16 addendum confirmed the contract that Royal created when it agreed to the terms of the addendum over the telephone with Mr. Wang's agent. Thus, irrespective of whether Royal executed the addendum before or after the settlement date on the contract, the writing satisfied the Statute of Frauds.[8] Accord-

---

8. We note also that the writing required by the Statute of Frauds could be satisfied by the September 21, 2005, letter Royal sent to Mr. Wang,

ingly, we affirm the circuit court's declaratory judgment that Royal defaulted on the contract by failing to settle by August 31, 2005, pursuant to the June 16, 2005, contract addendum, that Mr. Wang was the owner of the Property, and that the $25,000 deposit belonged to Mr. Wang.

## II.

### Unjust Enrichment

Royal next contends that the trial court erred in denying its claim for restitution, under the doctrine of unjust enrichment, for improvements it made to Mr. Wang's property. Royal contends that it would be inequitable to allow Mr. Wang to retain the improvements to the Property without paying the value of the improvements. He relies heavily on two statements made by Mr. Wang. The first statement was made in a pre-trial deposition, where Mr. Wang stated, in response to a question, that it would be unfair for him to keep the partially constructed house. The second statement was made to the County Attorney when Mr. Wang learned that Royal, in applying for a building permit, had misrepresented that the work was authorized by Mr. Wang. When the County Attorney inquired whether Mr. Wang wanted the County to issue a stop work order, Mr. Wang responded that Mr. Shahparast could build the house and he would keep the keys. In addition to relying on these statements, Royal argues that the Property is for sale and it would be an injustice to allow Mr. Wang to keep the cash windfall he will receive upon sale of the Property with the improvements.

---

wherein Mr. Shahparast stated that the "contract price is $600,000 as was agreed and signed by Mr. Wang and my Company." *See Bolene Refining Co. v. Zobisch Oil Co.*, 98 Okla. 202, 224 P. 942 (1923) (the moment there is written evidence of a contract, " 'the contract is taken out of the statute [of Frauds], even though such an admission is in the form of a letter repudiating the contract.' " (quoting *Capital City Brick Co. v. Atlanta Ice & Coal Co.*, 5 Ga.App. 436, 63 S.E. 562 (1909))). As indicated, the only contract providing for a price of $600,000 was the June 16, 2005, oral contract.

Mr. Wang counters that Royal was not a *bona fide posses-sor* of the Property because it was aware of Mr. Wang's objections to his construction, and that Royal is precluded from recovering on a claim of unjust enrichment because Royal's inequitable conduct does not justify an award of restitution. We agree and find no error in the trial court's order denying Royal's claim for unjust enrichment.

 A person unjustly enriched at the expense of another is required to make restitution to the other. *Everhart v. Miles,* 47 Md.App. 131, 138, 422 A.2d 28 (1980). Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Richard F. Kline, Inc. v. Signet Bank/Ma-ryland,* 102 Md.App. 727, 731, 651 A.2d 442(quoting *Everhart,* 47 Md.App. at 136, 422 A.2d 28), *cert. denied,* 338 Md. 201, 657 A.2d 795 (1995). A claim of unjust enrichment consists of three elements: (1) the plaintiff confers a benefit upon the defendant; (2) the defendant knows or appreciates the benefit; and (3) the defendant's acceptance or retention of the benefit "under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Hill v. Cross Country Settlements, LLC,* 402 Md. 281, 295, 936 A.2d 343 (2007). *Accord Jackson v. 2109 Brandy-wine, LLC,* 180 Md.App. 535, 574, 952 A.2d 304 (2008).

 There is no dispute in this case with respect to the first two elements. Mr. Wang clearly has received a benefit from the construction of a large house on his property, and there is no question regarding his knowledge of the benefit. The question in this case focuses on the third element of the test, *i.e.,* whether it would be inequitable for Mr. Wang to retain the improvements without paying the value of those improvements.

 Although " '[a] person is enriched if he has re-ceived a benefit,' the law does not consider him unjustly enriched unless 'the circumstances of the receipt of that benefit are such as between the two that to retain it would be

unjust.' " *Alternatives Unlimited, Inc. v. New Baltimore City Board of School Commissioners, et al.,* 155 Md.App. 415, 500, 843 A.2d 252 (2004) (quoting *First National Bank v. Shpritz,* 63 Md.App. 623, 640, 493 A.2d 410, *cert. denied,* 304 Md. 297, 498 A.2d 1184 (1985)). It is a "fundamental principle that it is not enrichment *per se* that obligates the beneficiary to make restitution to the benefactor but only **UNJUST** enrichment." *Alternatives,* 155 Md.App. at 500, 843 A.2d 252.

The third element of an unjust enrichment claim, whether it is inequitable or unjust for the beneficiary to retain the benefit without the payment of its value, is "a fact-specific balancing of the equities." *Hill,* 402 Md. at 301, 936 A.2d 343. "The equities of a case are usually taken to refer to matters of fault, ethical position, and delay." 1 DAN B. DOBBS, LAW OF REMEDIES § 2.4(5) (2nd ed.1993). "[T]he balancing of equities and hardships looks at the conduct of both parties and the potential hardships that might result from a judicial decision either way." *Id.*

In reviewing the trial court's balancing of the equities in a particular case, we review the balancing for an abuse of discretion. *See Ehrlich v. Perez,* 394 Md. 691, 708, 908 A.2d 1220 (2006) ("We apply the more deferential abuse of discretion standard to a trial judge's ruling involving a balancing of interests."); *Jackson,* 180 Md.App. at 576, 952 A.2d 304 ("restitution is an equitable remedy" that "affords the trial court considerable discretion in calculating the amount of money that should be returned to the owner"). The finding of facts upon which the balancing is based, however, is reviewed under a clearly erroneous standard. *See* Md. Rule 8–131(c).

The trial court here properly determined that the equities weighed heavily in Mr. Wang's favor because Royal acted with a shocking disregard of Mr. Wang's property rights, including demolishing Mr. Wang's house without a permit and constructing a house after receiving letters from Mr. Wang's attorney that explicitly warned Mr. Shahparast that he had no right to enter onto the Property. The trial court discussed the equities of the case as follows:

Even before Royal began to spend actual construction money, there was a serious dispute as to who was in breach of contract. Even though sold as a "tear down", and even though Royal was not acting under "color of title" (*Warwick v. Harvey,* [sic] 158 Md. 457, 462, 148 A. 592; *Porter v. Schaffer,* 126 Md.App. 237, 262, 728 A.2d 755), Royal cut down trees, demolished the Plaintiff's home before a permit had been issued, and began to build under a permit obtained under false certification after being told repeatedly to stay off the property by Wang's lawyer. By mid-November, 2005, and well before Royal began serious construction expenditures, all efforts by the parties to resurrect the sale had largely died. In the Court's view Royal's dollar expenditures, the majority of which were in 2006 and 2007, were not evidence of good faith, but rather an effort to "out muscle and out money" Wang, reflecting an arrogant "who cares" attitude. Even a litigant who believes 100% in the righteousness of his cause would not continue to build during the days the case was actually being tried in the courtroom.

The court, quoting 66 AM. JUR. 2D *Restitution and Implied Contracts* § 5 (2001), stated: "Where a person has officiously conveyed a benefit upon another, the other is enriched but is not considered to be unjustly enriched." [9]

Indeed, both this Court and the Court of Appeals have held that unjust enrichment does not exist where a benefit has officiously been thrust on another. *Hill,* 402 Md. at 301, 936 A.2d 343 ("[i]t is undisputed that once properly yoked with the label of 'mere volunteer' or 'officious payor' a plaintiff is prohibited from recovering" under a theory of unjust enrich-

---

9. We note that the December 22, 2004, addendum to the contract, which permitted Royal to perform "any repair/construction at buyer's cost and expense," provided that if Royal did not "go to the scheduled settlement 4/29/05, then all repair/or construction belong to the seller." The trial court, however, found that this provision was too vague and indefinite to be enforceable. Counsel for Mr. Wang asserted at oral argument that he was not relying on this language in support of his argument that he should not have to pay the value of the improvements to the Property.

ment.); *Alternatives Unlimited,* 155 Md.App. at 501, 843 A.2d 252 ("a person who officiously confers a benefit upon another is not entitled to restitution.").

In *Alternatives Unlimited,* we explained the term officiousness:

*Officiousness means interference in the affairs of others not justified by the circumstances* under which the interference takes place. Policy ordinarily requires that a person who has conferred a benefit by way of giving another services ... should not be permitted to require the other to pay therefor, unless the one conferring the benefit had a valid reason for so doing. *A person is not required to deal with another unless he so desires and, ordinarily, a person should not be required to become an obligor unless he so desires.*

*[W]here a person has officiously conferred a benefit upon another, the other is enriched but is not considered to be unjustly enriched. The rule denying restitution to officious persons has the effect of* penalizing those who thrust benefits upon others and *protecting persons who have had benefits thrust upon them.*

*Id.* at 501, 843 A.2d 252 (quoting RESTATEMENT OF RESTITUTION § 2 cmt.a (1937)).

Here, Royal officiously thrust the improvements to the Property on Mr. Wang. As the trial court noted:

Royal tore down Wang's home without authority. Wang objected to Royal's cutting trees to no avail. Three times Wang's lawyer told Royal to stay off the property—all to no avail.... After December, 2005, there was no evidence of continuing negotiations between the parties to resurrect the contractual relationship. In spite of all this, Royal continued to build! For two years this matter has been tied up in litigation, and, yet, Royal has still continued to build.

Despite the letters from Mr. Wang's attorney advising Royal to stay off the Property, and despite litigation regarding the status of the contract, Royal continued to build on the Property, spending $728,842 on the construction of a house.

Thus, although Royal may have conferred a benefit on Mr. Wang, it was conferred against Mr. Wang's wishes and "express directions." *See Alternatives,* 155 Md.App. at 502, 843 A.2d 252. Accordingly, even though Mr. Wang may be enriched by improvements made to the Property, there was no **UNJUST** enrichment in this case.

Once it is determined that Royal officiously conveyed the benefit to Mr. Wang, that is the end of the inquiry, and Royal is not entitled to recover under the theory of unjust enrichment. *See Hill,* 402 Md. at 302, 936 A.2d 343. Royal contends, however, that two statements made by Mr. Wang weigh against a finding of unjust enrichment. We are not persuaded.

Royal first notes that, during a deposition, Mr. Wang stated that it would be unfair for him to get the house without paying Royal for the improvements. This statement, by a lay witness, who testified at trial that he was not aware of the full extent of Royal's actions, does not mitigate against a legal conclusion that Royal, due to its own conduct, is not entitled to restitution.

The second statement relied upon by Royal is Mr. Wang's statement to the County Attorney in October 2005 that he would not request a stop work order, but rather, he would "keep the keys." The trial court found that Mr. Wang made this statement out of frustration because his house had already been demolished, rather than with the intent to confer legal rights upon Royal. The court observed, "isn't it just kind of an off hand statement, well, let him go ahead. I'll—I'll take the keys. You know, he won't stop. He's arrogant." The court further noted that Royal did not learn about Mr. Wang's statement until November 2006, and the court found that this statement did not give Royal an equitable defense. The court stated:

Royal never acted with good faith, always knew of Wang's contract claims, openly defied Wang's warnings to stay off the property, never proved reliance on Wang's statements to the Assistant County Attorney, and was never led to

continue to build on Wang's property, even up to the trial, by any action of Wang, and yet, spent hundreds of thousands of dollars on land that it knew had a serious legal question of rightful ownership.

Moreover, as the trial court noted in addressing Mr. Wang's trespass claim, *see infra*, once Royal learned of the statement in November 2006, Royal was on notice that Mr. Wang was going to seek possession of the new home; yet it continued to build. We agree with the trial court's assessment that Mr. Wang's statement to the County Attorney does not entitle Royal to restitution for improvements that Royal officiously conveyed to Mr. Wang, after Mr. Wang repeatedly told Royal to stay off his property.

Counsel for Royal, with commendable candor, acknowledges that "there is no disputing that Shahparast bears significant responsibility for the fiasco that the trial court was asked to unravel." We agree, and we find that the trial court did not abuse its discretion in balancing the equities here and declining to award damages under the doctrine of unjust enrichment.

### III.

### Trespass

Royal contends that the trial court erred in finding it liable for trespass, arguing that Mr. Wang consented to its presence on the Property when he stated to the County Attorney, in response to the offer to generate a stop work order against Mr. Shahparast's construction, that Mr. Shahparast could "go ahead and build the house...." For many of the same reasons set forth in addressing the unjust enrichment claim, we affirm the circuit court's order finding Royal liable for trespass.

"[T]respass is a tort involving 'an intentional or negligent intrusion upon or to the possessory interest in property of another.'" *Mitchell v. Baltimore Sun Co.*, 164 Md.App. 497, 508, 883 A.2d 1008 (2005) (quoting *Ford v. Baltimore City Sheriff's Office*, 149 Md.App. 107, 129, 814

A.2d 127 (2002)), *cert. denied,* 390 Md. 501, 889 A.2d 418 (2006). "In order to prevail on a cause of action for trespass, the plaintiff must establish: (1) an interference with a possessory interest in his property; (2) through the defendant's physical act or force against that property; (3) which was executed without his consent." *Id.* The determination of whether consent was given is a question of fact. *See McDermott v. Hughley,* 317 Md. 12, 27, 561 A.2d 1038 (1989) (noting that whether consent in fact was given was properly a question for the jury's consideration).

▮▮▮▮▮ Consent is a "complete defense" against a claim for trespass. *Mitchell,* 164 Md.App. at 510, 883 A.2d 1008; *accord Brazerol v. Hudson,* 262 Md. 269, 273, 277 A.2d 585 (1971); RESTATEMENT (SECOND) OF TORTS § 892A (1977). Consent may be express or implied. *Mitchell,* 164 Md.App. at 510, 883 A.2d 1008.

▮▮▮ Here, as indicated, *supra,* the trial court found that Mr. Wang's statement to the County Attorney was made out of frustration and did not constitute consent. The court stated:

> But these words, without any proof of reliance thereon by Royal, came after Royal demolished Wang's home before a permit had been issued, cut down trees, was told repeatedly to stay off Wang's property, and began to build on the property under a permit obtained with an untruthful certification. How many times did Wang have to say "no" before the law enforces the "no"? "Acquiescence is not invitation." See *Carroll v. Spencer,* 204 Md. 387, 393, 104 A.2d 628. Royal first learned of Wang's conversation with the Assistant County Attorney in November of 2006. From that conversation Royal knew if it continued to build, Wang was going to seek possession of the new home ("I'll keep the keys"). This hardly provides a "consent" that would negate trespass.

The circuit court's factual finding that Mr. Wang did not consent to the construction was supported by the record and not clearly erroneous.

 Royal further contends, however, that even if it was liable for trespass, the trial court erred in awarding damages in the amount of $45,600. In arriving at this figure, the trial court stated: "Where trespass is committed by occupying and using the realty, the measure of damages is the fair rental price of the realty during such use. Wang has been deprived of the use of his property for almost two years." There was evidence that the monthly rental value of the Property was $1,900; that value multiplied by the 24 months that Mr. Wang was deprived of his property equals $45,600.

Royal argues that the trial court improperly calculated damages based on a rental value of $1,900 per month because, at the time of the trespass, "Wang's property had been condemned and could not have been rented to anyone." Mr. Wang counters, however, that an expert appraisal report was admitted into evidence that substantiates the figures relied upon by the trial court. Because this report, which took into consideration the condition of the Property prior to its demolition, set forth a rental value of the Property of $1,900 per month, there was no error in the award of damages for Royal's trespass on the Property.

## IV.

### Contempt

As indicated, on October 3, 2007, the trial court issued orders declaring that Mr. Wang owned the Property, finding that Royal was liable for trespass, and denying Royal restitution for improvements it made on the Property. On October 8, 2007, after receiving a copy of the orders, Mr. Shahparast wanted to remove things from the Property. After being told by Mr. Wang's attorney that he could not enter the Property, and after agreeing not to reenter the house until the issue could be resolved when the court opened the next day, Mr. Shahparast reentered the Property and removed a large number of installed cabinets. The trial court found Mr. Shahparast in constructive civil contempt for violating the October 3 court orders.

Royal contends that the trial court erred in finding Mr. Shahparast in contempt of court. He asserts three grounds of error: 1) the order did not prohibit his removal of the cabinets from the Property; 2) Mr. Shahparast's conduct was not willful; and 3) the trial court exceeded its power in awarding compensatory damages. In response, Mr. Wang argues that, although the October 3, 2007, order did not specifically instruct Royal to remain off Mr. Wang's property, the order was sufficiently clear because it stated that Royal was liable for trespass, it ejected Royal from the Property, and it awarded the improvements on the Property to Mr. Wang. Moreover, Mr. Wang argues that the trial court's factual finding regarding Mr. Shahparast's willful violation of the order is supported by sufficient evidence. With respect to Royal's third claim, Mr. Wang argues that this case presents the "exceptional circumstances" necessary to sustain a monetary award in a contempt action.

Civil contempt "proceedings are generally remedial in nature and are intended to coerce future compliance." *State v. Roll*, 267 Md. 714, 728, 298 A.2d 867 (1973). Sanctions imposed in the civil context seek "to coerce compliance with court orders for the benefit of a private party or to issue ancillary orders for the purpose of facilitating compliance or encouraging a greater degree of compliance with court orders." *Dodson v. Dodson*, 380 Md. 438, 448, 845 A.2d 1194 (2004). In contrast, "criminal contempt is punishment for past misconduct" and the sanction "may be purely punitive." *Roll*, 267 Md. at 728, 298 A.2d 867. Because of the remedial purpose of civil contempt, "[t]he sanction imposed for civil contempt ... must allow for purging." *In re Ann M.*, 309 Md. 564, 569, 525 A.2d 1054 (1987).

"Before a party may be held in contempt of a court order, the order must be sufficiently definite, certain, and specific in its terms so that the party may understand precisely what conduct the order requires." *Droney v. Droney*, 102 Md.App. 672, 684, 651 A.2d 415 (1995). Moreover, "one may not be held in contempt of a court order unless the

failure to comply with the court order was or is willful." *Dodson*, 380 Md. at 452, 845 A.2d 1194. Civil contempt must be proven by a preponderance of the evidence. *Bahena v. Foster*, 164 Md.App. 275, 286, 883 A.2d 218 (2005). " 'This Court will only reverse such a decision upon a showing that a finding of fact upon which the contempt was imposed was clearly erroneous or that the court abused its discretion in finding particular behavior to be contemptuous.' " *County Com'rs for Carroll County v. Forty West Builders, Inc.*, 178 Md.App. 328, 394, 941 A.2d 1181 (quoting *Droney*, 102 Md. App. at 683–84, 651 A.2d 415), *cert. denied*, 405 Md. 63, 949 A.2d 652 (2008). We find no error or abuse of discretion in the circuit court's order of constructive civil contempt in this case.

After a hearing, the trial court made the following findings of fact:

[O]n October 3, 2007, the Court signed and brought to the Clerk's Office a Memorandum Opinion, Declaratory Judgment, and Order of Court reflecting the Court's findings in its Memorandum Opinion. By October 8, 2007, the October 3, 2007, Orders were not, as of yet, docketed in the Clerk's Office. Sean Shahparast, from the evidence, actually received a copy of the Memorandum Opinion, Declaratory Judgment, and Order of this Court, all dated October 3, 2007, on October 8, 2007. . . .

The evidence reflected that after a dispute on October 8, 2007, between Mr. Shahparast and counsel for the Defendant at 5821 Goldsboro Road as to who had the right to possession of the property, and after the refusal by the Montgomery County Police to enforce this Court's Order because it was not certified, both parties, Royal Investment Group through Sean Shahparast, and the Defendant, through his counsel, agreed to maintain the "status quo" and do nothing further until consultation with the Court the next day. October 8, 2007, was a holiday.

On October 8 at some unknown time, Sean Shahparast subsequently spoke with his attorney . . . and inquired if he could enter the property and "take his property out of the

premises". [His attorney] had earlier received all of the documents but had not advised his client of the reception of the documents or the meaning thereof. On the October 8 telephone call [Mr. Shahparast's attorney] advised Mr. Shahparast that he had no idea of the effect of the Order since it had not been docketed and could not give him advice. Mr. Shahparast on the same day also spoke by telephone with a friend who was a Maryland attorney.... Without awareness of the opinion and award of trespass damages, and without actually seeing the documents, [the attorney] testified that he did not tell Mr. Shahparast what he could and could not do, but rather spoke in generalities advising him, wrongfully in the Court's view, that an Order has to be docketed to be enforced and that, per his "on line" check, this Order had not been docketed, that he, Mr. Shahparast, was free to go on the property if there was no breach of the peace, and could remove his property that belonged to him as long as the property could be removed without substantial damage to the real property itself. Sean Shahparast and 3 to 4 of his workmen unscrewed from the walls of the home and the abutting sides the installed cabinets and removed them, together with a kitchen stove hood laying loose on the floor of the home in 4 to 5 truckloads, with Mr. Shahparast flashing the middle finger at a security guard hired by the attorney for Wang who was taking photographs of the removal. It is unknown how the assisting workmen gained access to the property because the property was constantly being watched and Mr. Shahparast was the only person seen entering the property before the removal began. The Court accepts expert opinion evidence that the replacement cost of the items removed was $75,000.00, an additional $5,000.00 for reinstallation of the cabinetry, and $1,000.00 to $2,000.00 to repair dents and scratches resulting from the earlier removal of the cabinets.

## A.

Royal first argues that the trial court's October 3, 2007, order was not "definite, certain and specific in its

terms," and therefore, it did not give Royal sufficient notice that it could not enter onto the Property and remove $75,000 worth of installed cabinets. Royal argues that the order was insufficient because it "failed specifically to prohibit the very conduct for which he was cited." We disagree.

The trial court's order stated, in part:

2. The Court enters judgment for Don C. Wang on Royal's [sic] Investment Group's claims for Quantum Meruit (Count IV) and Unjust Enrichment (Count V); and

\* \* \*

4. The Court enters judgment in favor of Don C. Wang against Royal Investment Group in his Counter Claim for Trespass (Count III) in the amount of $45,600.00; and

5. The Court enters judgment of possession of 5821 Goldsboro Road . . . in favor of Don C. Wang against Royal Investment Group, LLC, on Don C. Wang's Counter Claim for Ejectment (Count IV). . . .

This order clearly communicates the following: (1) Royal entered onto Mr. Wang's property without any right, which is evident from the trial court's ruling on the trespass claim; (2) Royal did not have any legal right to remain on the Property, which is evident from the trial court's ruling based on the ejectment claim; and (3) Royal did not have any right to the improvements on the Property, which is evident based on the trial court's ruling on the unjust enrichment claim. We believe these rulings clearly prohibited Royal from further trespassing onto the Property. And, even if the order did not state specifically that Royal was to stay off the Property, going onto the Property and removing $75,000 worth of cabinets amounted to a subtle defeat of the order, which qualifies as contempt. *See Goldsborough v. State,* 12 Md.App. 346, 356, 278 A.2d 623 (1971) (subtle defeat of an order of court is a contempt).

Royal notes that, after it removed the cabinets on October 8, the trial court issued a subsequent order that specifically enjoined Royal and Sean Shahparast from entering onto the

Property, authorized the Montgomery County Police and Sheriff's Office "to use force, if necessary, to remove" them from the Property, and explicitly stated that the order was immediately enforceable. We believe, however, that the trial court's subsequent order was deemed necessary solely based on Mr. Shahparast's extraordinary conduct in defying the trial court's initial order. It does not take away from our finding that Royal's conduct violated the initial order. Therefore, we conclude that the trial court's October 3, 2007, order was "definite, specific, and certain" and gave sufficient notice that Royal's conduct was prohibited.

## B.

▮▮▮▮▮ Royal next contends that Mr. Shahparast did not wilfully violate the court orders. Willful conduct is action that is "[v]oluntary and intentional, but not necessarily malicious." BLACK'S LAW DICTIONARY 1630 (8th ed.2004); *accord Wells v. Polland,* 120 Md.App. 699, 719, 708 A.2d 34 (1998) ("Willful misconduct is performed with the actor's actual knowledge or with what the law deems the equivalent to actual knowledge of the peril to be apprehended, coupled with a conscious failure to avert injury."). The trial court stated the following in support of its determination that Mr. Shahparast's actions were "willful:"

> Unable to obtain advice to his liking from his own lawyer, the consultation with a lawyer who was a stranger to the case, the complete disregard of his earlier agreement to maintain the status quo, the surreptitious entry of the workmen knowing the home was being watched, the obscene gesture, and the history recited in this paragraph all reflect on Mr. Shahparast's "mindset" and his "willfulness".

> Not only was Mr. Shahparast a trespasser, but, additionally, he had been ejected from the property by Court Order. Orders must be complied with promptly. Litigants who make private determinations of the law and refuse to obey Orders run the risk of contempt, even if the Order is ultimately ruled incorrect.

The trial court relied on sufficient evidence to conclude that Mr. Shahparast acted wilfully in defying the court order.

## C.

■ Royal's final argument regarding the finding of contempt is that the trial court improperly ordered incarceration, with a purge provision that Royal pay a $75,000 fine to Mr. Wang.[10] Royal argues that this fine was essentially an award of compensatory damages, which the Court of Appeals held, in *Dodson*, 380 Md. at 454, 845 A.2d 1194, could not be recovered in a civil contempt action. Mr. Wang argues that the trial court's purge provision was a proper order to coerce present or future compliance with a court order. Alternatively, Mr. Wang alleges that, even if the fine was an award of compensatory damages, it was appropriate under the "exceptional circumstances" of this case. We affirm the circuit court's ruling.

As indicated, the purpose of civil contempt is to coerce present or future compliance with a court order. *Dodson*, 380 Md. at 448, 845 A.2d 1194. Here, the circuit court expressly stated its intent to provide for future compliance with a court order:

> So having found the defendant in contempt of the order of this Court, the next proposition is what to do under the situation.
>
> The Court wants this order enforced. It wanted it enforced back on October 3rd. It wants it enforced for the future. The Court wants it enforced at this point for the future. . . .

It is not clear to us, however, how the court's order providing for a $75,000 fine as a purge provision was intended to coerce present or future compliance with a court order.

We agree with the trial court, however, that the facts of this case involve "exceptional circumstances" that the Court of

---

**10.** Mr. Shahparast posted the $75,000, together with an additional 10% interest, in the registry of the court, as security in lieu of bond pending appeal.

Appeals in *Dodson* suggested "could form the basis for a monetary award in a civil contempt case." 380 Md. at 454, 845 A.2d 1194. In *Dodson,* the Court held that "compensatory damages may not *ordinarily* be recovered in a civil contempt action," and "may never be recovered in a civil contempt action based upon a past negligent act by the defendant." *Id.* at 454, 845 A.2d 1194. (Emphasis added.) In that case, Mr. Dodson negligently failed to pay an insurance premium for Ms. Dodson's personal property as required in a *pendente lite* order. *Id.* at 441, 845 A.2d 1194. A fire broke out in the condominium, and the failure to pay the insurance prevented Ms. Dodson from recovering insurance money on her lost personal property. *Id.* Ms. Dodson filed a contempt action, and the circuit court awarded her $19,311 in compensatory damages. *Id.* at 444, 845 A.2d 1194.

In reversing the circuit court's order, the Court of Appeals reasoned that the monetary award "cannot be reconciled" with the purpose of civil contempt because the award was not intended to "coerce the defendant's present or future compliance with the earlier *pendente lite* order." *Id.* at 451, 845 A.2d 1194. Rather, the purpose of the award "was to impose a sanction" "for a past failure to comply with a court order." *Id.* at 452, 845 A.2d 1194. The Court of Appeals also noted that the lawsuit, "although labeled a civil contempt action, was in essence a tort suit for money damages," but the circuit court denied the husband's request for a jury trial because it was a contempt action. *Id.* at 453, 845 A.2d 1194. The Court of Appeals concluded that "compensatory damages may never be recovered in a civil contempt action based upon a past negligent act by the defendant." *Id.* at 454, 845 A.2d 1194.

The Court went on to note, however, that the case did not present the issue of "whether, under exceptional circumstances, a willful violation of a court order, clearly and directly causing the plaintiff a monetary loss, could form the basis for a monetary award in a civil contempt case. We shall leave the resolution of that question for another day." *Id.* at 454, 845 A.2d 1194. That question is presented in the instant case.

We believe that Maryland should join the "clear majority of state courts" that permit, in appropriate circumstances, a monetary sanction in a civil contempt proceeding to compensate for damages caused by the contemnor. *See* Annotation, *Right of Injured Party to Award of Compensatory Damages or Fine in Contempt Proceedings,* 85 A.L.R.3D 895, 897 (1978). To be sure, some of these states have statutes that specifically authorize compensatory fines for civil contempt. *See, e.g., Getka v. Lader,* 71 Wis.2d 237, 238 N.W.2d 87, 93 (1976) (upholding award of damages based on contempt statute providing that court may order "a sufficient sum to be paid by the defendant to indemnify him and satisfy his costs and expenses"); *Jamie v. Jamie,* 19 A.D.3d 330, 798 N.Y.S.2d 36, 37 (N.Y.App.Div.2005) (pursuant to statute regarding civil contempt, where actual loss has been caused by contempt, aggrieved party is entitled to recover not only amount of loss, but also reasonable costs and expenses in proving the contempt and amount of loss).

Maryland has no statute specifically authorizing compensatory fines for civil contempt, but that does not mean such fines are never permitted. Other states without a specific statute addressing the issue have held by judicial decision that, in the appropriate circumstances, the court may impose a fine as compensation to the injured party for damages sustained as a result of the contempt. *See, e.g., Lord v. Mansfield,* 50 Conn.App. 21, 717 A.2d 267, 274 ("sanctions for civil contempt may be either a fine or imprisonment; a fine may be remedial or it may be the means of coercing compliance with the court's order and compensating the complainant for losses sustained"), *cert. denied,* 247 Conn. 943, 723 A.2d 321 (1998); *Phillips v. Delks,* 880 N.E.2d 713, 720 (Ind.Ct.App.2008) (in civil contempt cases, monetary damages may be awarded to compensate the other party for injuries incurred as a result of the contempt, including "the inconvenience and frustration suffered by the aggrieved party"). *Louisville Metro Dept. of Corrections v. King,* 258 S.W.3d 419, 422 (Ky.Ct.App.2007) (upheld imposition of $160 fine; award of compensatory damages remedial measure that serves purpose of forcing compli-

ance with court's order or to compensate for losses or damages caused by non-compliance); *Citicasters Co. v. Stop 26–Riverbend, Inc.*, 147 Ohio App.3d 531, 771 N.E.2d 317, 328 (compensatory fine to compensate complainant for contemnor's past disobedience proper for civil contempt), *appeal dismissed*, 96 Ohio St.3d 1404, 770 N.E.2d 594 (2002).

 We agree with those states that allow, in appropriate circumstances, the award of compensatory damages in a civil contempt case. Accordingly, and subject to the limitations set forth in *Dodson*, we hold that, under "exceptional circumstances," a willful violation of a court order, which clearly causes the plaintiff a monetary loss, can form the basis for a monetary award in a civil contempt case.

The trial court found that "exceptional circumstances" were present here based on Royal's willful violation of the October 3 court orders. We agree. The trial court made the following factual findings: 1) Mr. Shahparast received a copy of the court order granting possession of the Property to Mr. Wang and ejecting Mr. Shahparast from the Property; 2) Mr. Shahparast was advised by counsel for Mr. Wang that he did not have a right to possession of the Property; 3) Mr. Shahparast's attorney told Mr. Shahparast that he could not advise whether Mr. Shahparast could enter the Property and "take his property out of the premises"; 4) Mr. Shahparast agreed with Mr. Wang's attorney to "keep the status quo" until the court opened the next day; and 5) "in complete disregard of his earlier agreement to maintain the status quo," Mr. Shahparast entered the home with several workers and "unscrewed from the walls" and removed $75,000 worth of installed cabinets from the home. These facts, combined with the facts elicited at the hearing that Royal demolished Mr. Wang's home before a permit was issued, and, after repeatedly being told by Mr. Wang's attorney to stay off the Property, constructed the home, amount to egregious conduct by Mr. Shahparast.

Moreover, the trial court found that, unlike in *Dodson*, "[t]here was no evidence ... or even suggestion ... of a

potential contributory negligence claim, or a potential Royal cross claim" that might weigh in favor of requiring a separate tort claim to recover damages. Given this fact, Mr. Shahparast's egregious conduct, and the protracted litigation that Mr. Wang has already endured, we agree with the trial court that there were "exceptional circumstances" justifying compensatory damages. Accordingly, we affirm the circuit court's order of incarceration, with a $75,000 purge provision.

## V.

### Attorney's Fees

Royal finally argues that the $179,907.60 award for attorney's fees should be vacated. It contends that, in light of the trial court's decision awarding Mr. Wang possession of the improvements on the Property, the award of attorney's fees is "a windfall constituting an impermissible penalty." Royal also claims that the records of billable hours, which Mr. Wang's attorneys appended to his petition for attorney's fees, switched the burden of proof and prevented Royal from challenging the petition because the bills do not "link up" the billed hours to sums listed in the petition. Mr. Wang counters that the attorney's fees did not constitute a penalty because he incurred substantial fees asserting his property rights, and the trial court relied upon sufficient evidence in calculating an award of reasonable attorney's fees. We hold that the trial court did not abuse its discretion in awarding Mr. Wang $179,907.60 in attorney's fees.

"Maryland generally adheres to the common law, or American rule, that each party to a case is responsible for the fees of its own attorneys, regardless of the outcome." *Friolo v. Frankel*, 403 Md. 443, 456, 942 A.2d 1242 (2008). A trial court may award attorney's fees if "(1) the parties to a contract have an agreement to that effect, (2) there is a statute that allows the imposition of such fees, (3) the wrongful conduct of a defendant forces a plaintiff into litigation with a third party, or (4) a plaintiff is forced to defend against a malicious prosecution." *Nova Research, Inc. v. Penske Truck*

*Leasing Co.,* 405 Md. 435, 445, 952 A.2d 275 (2008) (quoting *Thomas v. Gladstone,* 386 Md. 693, 699, 874 A.2d 434 (2005)). "Where an award of attorney's fees is called for by the contract in question, the trial court will examine the fee request for reasonableness, even in the absence of a contractual term specifying that the fees be reasonable." *Atlantic Contracting & Material Co., Inc. v. Ulico Cas. Co.,* 380 Md. 285, 316, 844 A.2d 460 (2004). "The party requesting fees has the burden of providing the court with the necessary information to determine the reasonableness of its request." *Myers v. Kayhoe,* 391 Md. 188, 207, 892 A.2d 520 (2006). Although the interpretation of a clause in a contract providing for attorney's fees is a question of law reviewed *de novo, Nova,* 405 Md. at 448, 952 A.2d 275, "the trial court's determination of the [r]easonableness of [attorney's] fees is a factual determination within the sound discretion of the court, and will not be overturned unless clearly erroneous." *Id.* n. 4; *accord Holzman v. Fiola Blum, Inc.,* 125 Md.App. 602, 637, 726 A.2d 818 (1999).

The initial contract for the Property signed by Mr. Wang and Mr. Shahparast included a fee-shifting provision stating that the trial court "shall" award "reasonable attorney's fees" to the "prevailing party" in a lawsuit based on the contract. The clause provided as follows:

> 28. ATTORNEY'S FEES: In any action or proceeding between Buyer and Seller based, in whole or in part, upon the performance or non-performance of the terms and conditions of this Contract, including, but not limited to, breach of contract, negligence, misrepresentation or fraud, the prevailing party in such action or proceeding shall be entitled to receive reasonable attorney's fees from the other party as determined by the court or arbitrator.

In the context of an award of attorney's fees, a litigant is a "prevailing party" if he succeeds "on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'" *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (quoting

*Nadeau v. Helgemoe,* 581 F.2d 275, 278–79 (1st Cir.1978)). Mr. Wang clearly was the "prevailing party" because the trial court ruled in his favor on the core claims that formed the basis of the dispute between the parties, including the declaratory judgment, trespass, ejectment, and the unjust enrichment claim, and it also found that Royal breached the contract between the parties when it failed to settle prior to August 31, 2005. Indeed, Royal acknowledges that, unless we were to accept its arguments on other issues and reverse the trial court, Mr. Wang is the prevailing party pursuant to the contract. And the contract provided that Mr. Wang, as the prevailing party, was entitled to reasonable attorney's fees.

■■■ Consequently, we turn to the question of whether the trial court's award of attorney's fees was reasonable under these circumstances and whether the award was supported by sufficient evidence. Royal contends that, in light of the trial court's ruling granting the improvements to the Property to Mr. Wang, the award of attorney's fees in this case was an "impermissible penalty." The trial court noted, however, that the benefit "is questionable because the house is not completed, the real estate market is down," and "unknown fixtures have been removed from the home." In any event, Mr. Wang incurred attorney's fees, and the contract provided that, as the prevailing party, he was entitled to recover from Royal reasonable attorney's fees.

■■■ We reject Royal's claim that the evidence was insufficient to support the trial court's award of $179,907.60 in attorney's fees. "The sufficiency of the evidence presented as to attorneys' fees must be more than simply the number of hours worked, but less than a line by line analysis of services rendered." *Long v. Burson,* 182 Md.App. 1, 26, 957 A.2d 173 (2008). This Court explained:

> A fee is not justified by a mere compilation of hours multiplied by fixed hourly rates or bills issued to the client; [ ] *a request for fees must specify the services performed, by whom they were performed, the time expended thereon, and the hourly rates charged;* [ ] it is incumbent upon the party

seeking recovery to present detailed records that contain the relevant facts and computations undergirding the computation of charges; [ ] without such records, the reasonableness, *vel non*, of the fees can be determined only by conjecture or opinion of the attorney seeking the fees and would therefore not be supported by competent evidence.

*Id.* (quoting *Maxima Corp. v. 6933 Arlington Development Ltd. Partnership,* 100 Md.App. 441, 453–54, 641 A.2d 977 (1994) (emphasis in original).).

Here, the trial court, after reviewing the bills and hearing testimony, concluded that the bills provided sufficient detail:

The Court has reviewed the numerous time sheet entries and finds that the overwhelming majority of them provide sufficient detail.... The Court further finds it was reasonable in almost all incidents to list multiple tasks together as a single charge. Generally, the tasks on their face appear substantially related. Additionally, in some instances, the additional tasks were so minor as to almost certainly represent only a small fraction of the time being charged. Accordingly, the Court finds that in general the Defendant has provided sufficient information to reach its burden of proof.

The trial court, in a lengthy, detailed, written opinion, discussed the hours reasonably expended by Mr. Wang's counsel. The court made several adjustments lowering the award below Mr. Wang's initial request of $350,000. We find no abuse of discretion in the award of attorney's fees to Mr. Wang.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**